1  Chad M. Knight (MT #12678)
2  Knight Nicastro LLC
   929 Pearl Street, Suite 350
3  Boulder, CO 80302
   (303) 815-5869
4  knight@knightnicastro.com

5  Anthony Nicastro
   Knight Nicastro LLC
6  401 North 31st Street, Suite 770
7  Billings, MT 59101
   (406) 702-1935
8  nicastro@knightnicastro.com

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MONTANA
## GREAT FALLS DIVISION

| | |
|---|---|
| Korey L. Aarstad, et al. )<br><br>Plaintiffs, )<br> )<br>vs. )<br> )<br>BNSF RAILWAY COMPANY, a Delaware )<br>corporation; JOHN SWING; MARYLAND )<br>CASUALTY COMPANY, a Maryland )<br>Corporation; ROBINSON INSULATION )<br>COMPANY, a Montana Corporation for )<br>profit; and DOES A-Z, )<br> )<br>Defendants. ) | Cause No. _____<br><br><br>**BNSF RAILWAY COMPANY'S**<br>**NOTICE OF REMOVAL** |

TO THE HONORABLE JUDGES AND CLERK OF THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF MONTANA:

PLEASE TAKE NOTICE that Defendant BNSF Railway Company ("BNSF"), by and through its undersigned counsel, joined by co-defendants by and through their undersigned counsel, hereby removes to this Court Cause No. DDV-16-0785, currently pending before the Montana Eights Judicial District Court for Cascade County (the "State

Court Action"), to the United States District Court for the District of Montana, Great Falls Division, pursuant to 28 U.S.C. §§ 1332 and 1441, and respectfully shows as follows:

## I.   INTRODUCTION

1.     On September 23, 2016, Plaintiffs commenced this action against Defendants BNSF Railway Company, Maryland Casualty Company, CNA Insurance Companies, Continental Casualty Company, Transportation Insurance Company, Robinson Insulation Company, and Does A-Z. A true and correct copy of the Plaintiffs' Complaint and Demand for Jury Trial ("Complaint") is attached as Exhibit A. On February 24, 2017, Plaintiffs filed a Notice of Dismissal of CNA Insurance Companies, Continental Casualty Company, and Transportation Insurance Company (Exhibit B). BNSF accepted service of the complaint on August 4, 2017 when it entered an appearance in state court. (Exhibit C). Plaintiffs include 192 claimants.[1] Plaintiffs assert claims for relief against defendants based upon negligence, strict liability, and bad faith. *See* Complaint at Counts I-V.

2.     This Court possesses jurisdiction over Plaintiffs' Complaint pursuant to 28 U.S.C. §§ 1332(d)(11), as this case qualifies as a mass action, removable as a class action under paragraphs (2) through (10) of the same statute.

## II.   THIS CASE QUALIFIES FOR REMOVAL AS A MASS ACTION.

3.     Pursuant to 28 U.S.C. §1332(d), this district court is vested with original jurisdiction over any civil action in which the matter in controversy exceeds the sum or value of $5,000,000, and is a mass action in which the parties satisfy minimal diversity.  As described in 28 U.S.C. §1332(d)(11), "a mass action shall be deemed to be a class action

---

[1] *See,* Exhibit A attached to Plaintiffs' Complaint.

KNIGHT NICASTRO, L.L.C.
929 PEARL STREET, SUITE 350
BOULDER, CO 80302
(303) 815-5869

removable under paragraphs (2) through (10) if it otherwise meets the provisions of those paragraphs." To qualify as a mass action, a case must meet the following criteria:

    i.      Numerosity requirement that the action involves the monetary claims of 100 or more individual plaintiffs;

    ii.     Amount in controversy, in the aggregate, exceeds $5,000,000;

    iii.    Diversity requirement of minimal diversity;

    iv.    Commonality requirement that the claims involve common questions of law or fact.

4.      On the face of the Complaint, it is clear that all four requirements are met.

5.      Plaintiffs claim monetary damages on behalf of 192 plaintiffs, alleging damages for, among other things, lost earnings, lost earning capacity, lifetime medical and disability care, loss of insurability, pain and suffering, and bodily injury, as well as punitive damages.[2]

6.      Given the number of named Plaintiffs, it is apparent that the claims alleged involve an aggregate amount in controversy that exceeds $5,000,000. Plaintiffs cannot reasonably dispute that the amount in controversy in this matter exceeds the $5,000,000 threshold. To further establish the amount in controversy, Defendant served Plaintiffs with a Request for Statement of Damages on July 31, 2017, pursuant to Mont. Code § 25-4-312. (See Attached Exhibit D.) Plaintiffs responded on August 11, 2017, indicating that the range of damages for each of the 192 is as follows: for special damages in the form of medical expenses, in excess of $100,000.00. They assert general damages for each of the 192 plaintiffs, between $200,000.00 and $2,000,000.00. (See Attached Exhibit E.)

---

[2] *See,* Complaint at ¶163-164.

PAGE - 3

7.      Minimal diversity means that at least one plaintiff and one defendant are from different states.  *Id., see also, Evans v. Walter Indus.* 449 F. 3d 1159, 1163 (11th Cir. 2006).  Minimal diversity is met as at least one Plaintiff is a resident of Montana, and at least one Defendant is a non-Montana resident.[3]

8.      Finally, all Plaintiffs share common allegations and questions of law and fact against each named Defendant.[4]  Plaintiffs allege that similar activities engaged in by each defendant caused or contributed to their asbestos-related illness.

9.      Accordingly, removal of this case as a mass action is appropriate.

**B.      All Other Requirements Have Been Complied With:**

10.      Pursuant to 28 U.S.C. § 1446(d), BNSF has given written notice of the Notice of Removal to the adverse party and has filed a copy of the notice with the clerk of the Montana's Eighth Judicial District, Cascade County. A true and correct copy of Defendant BNSF's Notice of Filing of Notice of Removal is attached as Exhibit F.

11.      All other defendants join in this motion, as indicated by the certificate of consent executed below.

12.      Pursuant to 28 U.S.C. § 1446(a), a copy of the following process, pleadings, and orders that were served upon the Defendant or filed in the state court action are attached as follows:

**Exhibit A**      Plaintiffs' Complaint and Demand for Jury Trial.

**Exhibit B**       Plaintiffs' Dismissal of CNA Defendants.

**Exhibit C**      Defendant BNSF's Entry of Appearance.

---

[3] *See,* Complaint at ¶ 1-6.
[4] *See,* Complaint at Counts I-IX.

**KNIGHT NICASTRO, L.L.C.**
929 PEARL STREET, SUITE 350
BOULDER, CO 80302
(303) 815-5869

**Exhibit D** Defendant BNSF's Request for Statement of Damages pursuant to 25-4-312, MCA.

**Exhibit E** Plaintiffs' Response to Request for Statement of Damages pursuant to 25-4-312, MCA.

**Exhibit F** Defendant BNSF's Notice of Filing of Notice of Removal.

12. The instant action is being removed to the district court of the United States for the district and division embracing the place where such action is pending. 28 U.S.C. 1441(a).

DATED THIS 16TH DAY of AUGUST, 2017.

Respectfully Submitted,

By:  /s/ Chad M. Knight
Chad M. Knight
Anthony M. Nicastro
Nadia Patrick
Steven T. Williams
KNIGHT NICASTRO, LLC
519 Southwest Blvd.
Kansas City, MO 64108
Email: knight@knightnicastro.com
nicastro@knightnicastro.com
npatrick@knightnicastro.com
williams@knightnicastro.com
Telephone: (816) 853-9845
Facsimile: (303) 845-9299
**ATTORNEYS FOR DEFENDANT**
**BNSF RAILWAY COMPANY**

**KNIGHT NICASTRO, L.L.C.**
929 PEARL STREET, SUITE 350
BOULDER, CO 80302
(303) 815-5869

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

## **CERTIFICATE OF SERVICE**

I hereby certify that the original of the foregoing was served upon the following counsel of record by the means designated below on this 16th day of August2017:


[X]   U.S. Mail                     Roger Sullivan
[  ]   Federal Express             Allan M. McGarvey
[  ]   Hand Delivery               John F. Lacey
[  ]   Facsimile                   McGarvey, Heberling, Sullivan & Lacey, P.C.
[X]   Email                        345 First Avenue East
                                   Kalispell, MT 59901


                                   /s/ Chad M. Knight
                                   Chad M. Knight

**KNIGHT NICASTRO, L.L.C.**
929 PEARL STREET, SUITE 350
BOULDER, CO 80302
(303) 815-5869

Roger Sullivan
Allan M. McGarvey
John F. Lacey
McGarvey, Heberling, Sullivan & Lacey, P.C.
345 First Avenue East
Kalispell, MT 59901
(406) 752-5566

Attorneys for Plaintiffs

CLERK OF DISTRICT COURT
FAYE MCWILLIAMS

2016 SEP 23 PM 2: 26

FILED

BY _____
DEPUTY

## MONTANA EIGHTH JUDICIAL DISTRICT, CASCADE COUNTY

| | |
|---|---|
| KOREY L. AARSTAD, et al<br><br>    Plaintiffs,<br><br>v.<br><br>BNSF RAILWAY COMPANY, a Delaware corporation; JOHN SWING; MARYLAND CASUALTY COMPANY, a Maryland Corporation; CNA INSURANCE COMPANIES, a corporation; CONTINENTAL CASUALTY COMPANY, a corporation; TRANSPORTATION INSURANCE COMPANY, a corporation; ROBINSON INSULATION COMPANY, a Montana Corporation for profit; and DOES A-Z,<br><br>    Defendants. | CAUSE NO. **D D V - 1 6 - 0 7 8 5**<br>**DIRK M. SANDEFUR**<br><br><br>**COMPLAINT AND DEMAND FOR JURY TRIAL** |

## PARTIES

1. Plaintiffs/decedents (hereafter more simply referred to as "Plaintiffs") are those persons indicated on Exhibit "A" attached hereto and are current or former residents and/or frequent visitors of the Libby, Montana, Lincoln County area.

2. Defendant BNSF Railway Company (BNSF) is a corporation organized and existing under the laws of the State of Delaware and is engaged in interstate commerce with its headquarters in Fort Worth, Texas.

3. Defendant John Swing was a managing agent for BNSF in Libby, Montana and is a resident of Lincoln County, Montana.

Complaint and Demand for Jury Trial     1

**EXHIBIT A**

4.     Defendant Maryland Casualty Company is a Maryland corporation with its principal place of business in Maryland.

5.     Defendant CNA Insurance Companies (CNA) is a corporation doing business in the State of Montana.  Continental Casualty Company and Transportation Insurance Company are companies owned or operated by CNA, and are included in references herein to "CNA".

6.     Robinson Insulation Company (Robinson Insulation) is or was a Montana business corporation for profit with its principal place of business in Great Falls, Cascade County, Montana where Robinson Insulation operated a vermiculite expansion plant. Robinson Insulation engaged in conduct that resulted in the accrual of this tort action in Montana.

7.     Does A - Z are corporations or persons, whose identities are unknown at this time, and whose negligence and wrongful acts caused asbestos related bodily injuries in the listed Plaintiffs.

8.     Plaintiffs will seek to amend their complaint when the true names and capacities of Does A - Z are ascertained.

9.     Venue in this action is proper in Cascade County, Montana, because at least one of the defendants, Robinson Insulation, engaged in tortious conduct within Cascade County and is a resident of Cascade County.

10.     This Complaint is filed to protect statutes of limitations.

## GENERAL ALLEGATIONS

11.     In 1963 W.R. Grace & Co. (Grace) purchased an existing vermiculite  mine and mill in Libby, Montana (the Mine) from the Zonolite Company (Zonolite).  Grace operated the Mine from 1963 until 1990. The vermiculite was intermixed with a highly toxic form of asbestos.  The extraction of vermiculite from the ground and processing of it generated substantial airborne dust containing asbestos.  The dust was produced at the mine site, as well as in the town of Libby where expansion, bagging, storage and transport facilities were located.

12.     The Plaintiffs were Grace and Zonolite mine, mill or processing workers,

independent contractors, loggers, homeowners, gardeners, recreators, ball field players, lumbermill workers, railroad workers, spouse/children of Grace workers, or community members of Libby, Montana, or were otherwise distinctly exposed to asbestos in unique exposure events and in a wide variety of temporally separated, geographically distinct, and highly differentiated routes and circumstances. While Plaintiffs had repeated or continuous exposures, Plaintiffs' individual exposure are unique in time, location, form, and degree of asbestos contact, and as a result of which Plaintiffs have been diagnosed with asbestos disease. Plaintiffs were injuriously exposed to asbestos after 1963.

13.    At all times Plaintiffs were ignorant of the nature and extent of the life threatening risks and injury involved, and would not have continued to be exposed to such an environment if they had known the true facts.

14.    The Grace/Zonolite workers were not provided with coveralls or showers. As a result workers went home and into the community with asbestos dust on their clothing and in their cars, thereby extending the asbestos exposure. Similarly, invisible asbestos fibers from the mining operations infiltrated a broad variety of Libby area work sites, forests, recreation areas, homes, gardens, and numerous other distinct locations, resulting in hundreds of distinct routes and circumstances of exposure.

15.    As a result of failing to control dust from the mining, milling, processing, bagging, transport and a variety of uses of the vermiculite, workers, family members, members of the community, and others were exposed to the highly toxic asbestos.

16.    Without knowledge of the nature and extent of the asbestos hazard, Plaintiffs were denied, in the unique circumstances of their exposures, the options of avoiding exposure, demanding protective devices, demanding safer operations, changing jobs, or protecting themselves and their families.

17.    The Montana State Board of Health ("BOH" or "Board") was created in 1907 under § 1474, RCM (1907). The BOH was responsible for the "general supervision of the interests and health and life of the citizens of the state." § 2448, RCM (1921); § 69-105, RCM (1947).

18.    The Montana legislature mandated that as a part of the BOH's "functions,

powers and duties" that the Board "shall make sanitary investigations and inquiries regarding the causes of disease; . . . causes of mortality, and the effects of localities, employments, conditions . . . and circumstances affecting the health of the people." The BOH was further charged to "gather such information in respect to all these matters as it may deem proper for diffusion among and use by the people. . . ." § 2448, RCM (1921); § 69-105, RCM (1947) (as revised in 1961, Replacement, Vol. 4).

19.     The Montana Industrial Hygiene Act of 1939 Sections 2(1), (3) and (5), Ch. 127, L. 1939 (renumbered and codified at § 69-201-208, RCM (1947)) created within the BOH, an Industrial Hygiene Division (the Division) granting to the Division the powers to:

> (1) make studies of industrial hygiene and occupational disease problems in Montana industries; . . .
>
> (3) make investigations of the sanitary conditions under which men and women work in the various industries of the State; . . .
>
> (5) report to the industries concerned the findings of such investigations and to work with such industries to remedy unsanitary conditions.

20.     In 1955, the Industrial Hygiene Division was effectively eliminated by the legislative decree of § 69-201, RCM (1947)(1961, Replacement, Vol. 4) providing that the BOH "shall possess, exercise and administer all of the powers, functions and authority, and shall carry out, discharge and execute all of the duties, in the field of industrial hygiene" set forth in § 69-201-208, RCM (1947). Thus, the BOH became exclusively responsible for the State's programs for general public health and safety as well as occupational/industrial health and safety.

21.     § 69-105, RCM (1947) (1961, Replacement, Vol. 4) (effective 1955 to 1967) provided that the State Board of Health shall ". . . have general supervision of the interests of health and life of the citizens of the state," . . . "gather such information . . . as it may deem proper for diffusion," . . . and " . . . make sanitary investigations and inquiries regarding . . . employments . . . ."

22.     In 1967, the Montana legislature revised the public health and industrial hygiene statues, creating the Department of Health (DOH). § 1, Ch. 197, L. 1967. The

creation of the DOH resulted in the functions and duties of the BOH being divided between the BOH and the new DOH.

23.     The DOH assumed the responsibility to "make investigations, disseminate information, and make recommendations for control of diseases and improvement of public health to persons, groups, or the public." § 69-4110(3), RCM (1947) (1969, 2d Replacement, Vol.4).

24.     The DOH also became responsible for administering the industrial hygiene program (§ 69-4105(1), RCM (1947) (1969, 2d Replacement, Vol. 4)), requiring it to "investigate the conditions of work at any place of employment at any time," and to "report the findings of investigations to the industry concerned and co-operate with the industry in preventing or correcting  conditions which are hazardous to health." § 69-4203(3) and (4), RCM (1947) (1969, 2d Replacement, Vol.4) .

25.     The Montana Industrial Hygiene Act (1967),  § 20 *et seq.* Ch. 197, L. 1967, provided:

> The state board of health shall adopt rules and approve orders to correct or prevent conditions which are hazardous to health at any place of employment.

§ 69-4202, RCM (1947) ( 1969, Replacement, Vol. 4).

> The State Department of Health shall:
>
> (1) make studies, make recommendations, and issue orders approved by the State Board on industrial hygiene and on occupational diseases; ...
>
> (4) report the findings of investigations to the industry concerned and cooperate with the industry in preventing or correcting conditions which are hazardous to health;
>
> (5) enforce provisions of this chapter, and rules adopted by the State Board.

§ 69-4203, RCM (1947) ( 1961, Replacement, Vol. 4).

26.     § 69-4106, RCM (1947) (effective 1967 to 1971) provided that "The state Board shall . . . (d) . . . enforce rules and standards . . . for the preservation of public health and prevention of disease."

27.     § 69-4203, RCM (1947) ( 1961, Replacement, Vol. 4)  (effective 1967 to

1971) provided that the Board of Health: "shall . . . (3) . . . investigate the conditions of work . . . (4) . . . cooperate with the industry in preventing or correcting conditions which are hazardous to health."

28.    The Montana Clean Air Act, § 69-3905, RCM (1967), provided as follows:

It is hereby declared to be the public policy of this state and the purpose of this act to achieve and maintain such levels of air quality as will protect human health and safety.

§ 69-3909, RCM (1967) provided:

In addition to any other powers conferred on it by law the [State Board of Health] shall: . . .

(3) Issue such orders as may be necessary to effectuate the purposes of this act and enforce them by all appropriate administrative and judicial proceedings.

(4) Require access to records relating to emissions.

§ 69-3914, RCM (1967) further provided:

(1) Whenever the board has reason to believe that a violation of any provision of this act or rule made pursuant thereto has occurred, it may cause written notice to be served upon the alleged violator or violators. The notice . . . may include an order to take necessary corrective action within a reasonable period of time stated in the order.

29.    In 1971, the industrial hygiene statues were further revised by the Occupational Health Act, (OHA) of Montana. § 1, Ch. 316, L. 1971; § 69-4206, RCM (1947) (Supp. 1977). The policy and purpose of the OHA was:

(1) ... to achieve and maintain such conditions as will protect human health and safety, and to the greatest degree practicable, foster the comfort and convenience of the workers at any workplace of this state and enhance their productivity and well-being.

(2) To these ends it is the purpose of this act to provide for a coordinated statewide program of abatement and control of occupational diseases ....

30.    The OHA act mandated that the BOH (re-named the "Board of Health and Environmental Sciences" by the OHA) adopt rules implementing the Act, establish threshold limit values of airborne contaminants, and issue orders necessary to carry out the Act. The OHA granted the Department powers that included a requirement that the

DOH enforce orders issued by the Board, prepare and develop a comprehensive plan for the prevention, abatement and control of occupational diseases, determine "the degree of health hazard at any workplace" and "collect and disseminate information and conduct educational and training programs relating to the prevention and control of occupational diseases." § 69-4211.1(1), (3), (6) and (7), RCM (1947) (Supp.1977).

31.    Under the OHA, the Department also had the power to take enforcement actions and impose monetary penalties on violators of the OHA. §§ 69-4215 and 69-4221, RCM (1947) (Supp. 1977). Additionally, the OHA set forth a specific "emergency procedure" to be implemented by the Department upon discovering "a generalized hazard at a workplace" that "creates an emergency requiring immediate action to protect human health." § 69-4216(1), RCM (1947) (Supp. 1977). In such circumstances, the Department was required to order the persons causing or contributing to the hazard to "reduce or discontinue immediately the emissions creating the hazard." § 69-4216(1), RCM (1947) (Supp. 1977). In the absence of a general condition creating an emergency, the Department was granted the power to order the persons responsible for the "emissions from an operation ... causing imminent danger to human health" to reduce or discontinue such emissions immediately. § 69-4216(2), RCM (1947) (Supp. 1977).

32.    In 1978, the OHA was renumbered and became § 50-70-101, *et seq.* MCA. The public polices of the former state department of public health were extended through the department of public health and human services' charge to "(1) . . . protect and promote the public health, . . . [in that it]" shall: "(a) make inspections for conditions of public health importance and issue written orders for correction, destruction, or removal of the condition; (b) disseminate information and make recommendations for control of diseases and other conditions of public health importance; . . . ." § 50-70-102, MCA.

33.    The 1972 Montana Constitution provides in Article II § 3 that all persons have the inalienable right "to a clean and healthful environment" and provides in Article IX § 1(1) that "the State and each person shall maintain and improve a clean and healthful environment in Montana . . . ."

34.    In 1956 the State Board of Health, Division of Disease Control, undertook

an industrial hygiene study of the Zonolite mine and mill operation at Libby, Montana "to
determine if any of the components of this company were detrimental to the health of the
employees." The 1956 report, p. 3, found high dust levels, that the dust contained
asbestos, and that "the asbestos dust and the dust in the air is of considerable toxicity." It
cited medical literature. The 1956 report found dust levels greatly exceeding the asbestos
limit, and recommended dust control measures. The 1956 report, p. 6, states:

> Full recognition should be given to the fact that direct control measures
> alone are usually not enough to insure safe working conditions. The
> method of operations, proper maintenance of equipment and of
> housekeeping are equally essential to maintain healthful conditions.

> That until such time as the repair and maintenance of both the exhaust and
> ore conveying systems have been complete, all the men in the dry mill be
> provided with and required to wear an adequate respirator.

No further action was taken in 1956 and 1957.

35.     In 1958, the State Board of Health, Division of Disease Control, undertook
another industrial hygiene study of the Zonolite mine and mill operation "to determine if
any of the components of this company found to be detrimental to the health of the
employees during the last study in August, 1956 had been reduced or alleviated since that
time." The report again found dust levels greatly exceeding the asbestos limit, and
recommended dust control measures. The report, at p. 8, cites medical literature showing
that asbestosis is "a progressive disease with a bad prognosis," often fatal. The report, at
p. 8, finds that asbestos dust "concentrations had, as yet, not been reduced to a
satisfactory level over all . . . The dry mill still required a considerable amount of work
to reduce the dust in this area to an acceptable level." No further action was taken by the
State Board of Health, Division of Disease Control in 1958, 1959, 1960, or 1961.

36.     From its first undertaking at the Mine facility, Park and others in the
Accident Prevention Department at Maryland Casualty knew that they "had an
outstanding pneumoconiosis occupational disease exposure," and "soon learned that
there were 30 employees who lacked normal lung function." December 29, 1964 report
of L.E. Park to V.W. Zanone.

37.    In 1959, the State of Montana, State Tuberculosis Sanitarium treated Glenn Taylor, a Libby Zonolite mine worker, for shortness of breath and asbestosis.

38.    In 1961, the State of Montana, through formal death certificate reporting procedures, had notice that Glenn Taylor died of asbestosis, and that Charles Wagner, a mechanic at Zonolite in Libby, died of pulmonary fibrosis.

39.    In 1962, the State Board of Health, Division of Disease Control, undertook an industrial hygiene study of the Zonolite mine and mill operation "to determine if any of the components of the operations continued to be a threat to the health of the employees." The report again found dust levels far in excess of the asbestos limit, and recommended dust control measures. The report, at p. 4, concludes "as indicated in the findings of this study, it appeared that no progress had been made in reducing dust concentrations in the dry mill to an acceptable level and that, indeed, the dust concentrations had been increased, substantially, over those in the past." No further action was taken in 1962.

40.    In 1963, the State Board of Health, Division of Disease Control, undertook an industrial hygiene study of the Grace/Zonolite mine and mill. The report again found dust levels greatly exceeding the asbestos limit, and recommended dust control measures. The report, at p. 3, found a "hazardous condition existing at this plant." No further action was taken in 1963.

41.    In April of 1964, the State Board of Health, Division of Disease Control, undertook an industrial hygiene study of the Grace/Zonolite mine and mill "to determine if compliance with previous recommendations for the control of dust had been achieved." The report again found dust levels greatly exceeding the asbestos limit, and recommended dust control measures. The report cited an article by Dr. Irving Selikoff (1964), finding dangerous levels of asbestos disease in asbestos insulation workers with "light intermittent exposure to asbestos." The State knew that the Libby workers had heavy and frequent exposure to asbestos. The 1964 report states at p. 3, "the asbestos content of the material with which you are working appears to provide some serious potential for the development of disease if not properly controlled. In addition, the

discharge of large volumes of asbestos-laden dust at ground levels sets up a condition where all members of the plant can be exposed in addition to those who work in the dry mill." While still referencing the Selikoff article, the State's report noted that environmental exposure has been shown to cause lung abnormalities and a question of "possible widespread carcinogenic air pollution." The State's report identifies that "floating fibers do not respect job classifications," and that per Selikoff, "insulation workers undoubtedly share their exposure with workmates in other trades." The State cited to Selikoff for an example of asbestos fibers having been identified in individuals living near an asbestos factory, and noted that this demonstrates that exposure goes beyond employees and workmates, and into the surrounding community.

42.     In September, 1964, the State Board of Health, Division of Disease Control, undertook an industrial hygiene study of the Grace/Zonolite mine and mill "to determine if the concentrations were excessive as has been found in many previous studies." The report again found dust levels greatly exceeding the asbestos limit, and recommended dust control measures. The report states at p. 3 "the dust discharged at ground level from the main dust collection fan was continuously contaminating the whole plant work area and needs to be either raised substantially so the dust-laden air discharges substantially above the plant area or that cleaning be provided. There was much reentry of this dust into the working environment." The report concludes at p. 3 with the "hope that continued work to reduce dust concentrations will be done and that a continuous operation at acceptable levels will be achieved soon."

43.     In 1964, the State of Montana, through formal death certificate procedures, had notice that Albert Barney, a millworker at Zonolite in Libby died of cor-pulmonale.

44.     In 1966, the State of Montana, through formal death certificate reporting procedures, had notice that Walter McQueen, a miner from Libby, died of asbestosis.

45.     In 1967, the State Board of Health, Division of Disease Control, undertook an industrial hygiene study of the Grace/Zonolite mine and mill "to determine compliance with previous recommendations." The report, at p. 2, concluded "as in the past, the need for particularly close attention to the functioning of the dust control system,

condition of duct work, . . . was apparent. It was also apparent that a strict housekeeping program must be maintained." No further action was taken by the State Board of Health, Division of Disease Control in 1967, 1968, 1969, 1970 and 1971.

46.     In November 1967, evidence was presented to the Chairman of the State Industrial Accident Board that another worker at the Grace/Zonolite mine and mill had been diagnosed with asbestosis from work in the warehouse.

47.     In 1974 the Montana State Department of Health performed an investigation of the airborne asbestos exposure at the Grace mine and mill. No action was taken.

48.     From 1967 to about 1974, Grace regularly reported on the status of dust control at its operations in Libby to the State of Montana.

49.     All the above described reports of the State of Montana, Division of Disease Control, were delivered to Grace, or its predecessor, Zonolite. None of the reports were made public, nor were the Grace workers, their families, or members of the Libby community warned of what the State had found.

50.     The State continued to receive additional notice of the nature and extent of the asbestos hazard to Grace workers, their families, and members of the Libby community through a myriad of State agency activities and reports.

51.     In 1970, Grace applied to the State Board of Health for a variance from air pollution statutes (§ 69-3904 et. seq., RCM 1947). The State Board of Health granted Grace its desired exemption on September 11, 1970, thereby allowing Grace to continue its hazardous operations. Grace subsequently filed multiple renewal petitions for the variance, all of them based on Grace's representations to the State Board of Health that Grace needed to continue to operate the dry mill despite its inherent and previously identified problems with hazardous emissions. On September 27, 1974, the State Board of Health granted Grace its final variance.

52.     From 1970 to 1974, Grace requested, and the State granted, no less than seven variances or variance extensions. The State had the opportunity to deny the requests or require Grace to comply with industrial hygiene standards as a requirement of

any variance. The State was aware throughout this whole period that Grace continued to fail in its asbestos dust control measures, and that as a result of its failures excessive and dangerous amounts of asbestos were being emitted in violation of applicable requirements. The State knew that these failures posed a risk to human health, yet it knowingly and willingly passed on these multiple opportunities to shut down Grace's operations or exercise any of its authority to bring Grace into compliance with applicable standards by denying or under threat of denying the variances.

53.     The State exercised its authority at the Grace Libby operations through the Department of Health and Environmental Sciences. Beginning in December 1970, the Department of Health and Environmental Sciences received permit requests from Grace seeking authority to construct many various dust control systems at multiple sites involved in Grace's Libby operation. Between 1971 and 1980, the Department of Health and Environmental Sciences granted Grace no fewer than six different permits on dust control measures. All but one was approved without any stipulations.

54.     By 1971, 14 workers at the Grace mine and mill had died of asbestos disease.

55.     The Department of Health and Environmental Sciences also conducted no fewer than seven different inspections of Grace's Libby operations between April 1979 and October 1987. The State's notes from these inspections include a 1979 citation for violation of Air Contaminant Restriction based upon visible emissions from the dryer stack at the mill, and a 1987 discussion of "the asbestos situation at the mine with [Grace personnel]."

56.     In 1983, the Department of Health and Environmental Sciences received a report from the Environmental Protection Agency (EPA) regarding an epidemiological study of Libby Grace workers. The report identified to the State that 109 former Libby Grace employees had died, 16 workers had lung cancer, and two had mesothelioma, and that this was corroborative of written scientific opinion on the effects of asbestos exposure.

57.     The Department of Health and Environmental Sciences was involved in

quantifying and analyzing the Grace operation. Notably, the State received information on the quantity of vermiculite processed at the entire operation, received and sought information regarding the asbestos contained in the vermiculite and the health risks posed by exposure. However, the State failed to take action despite its continuous and ongoing involvement.

58.     The Department of Health and Environmental Sciences wrote to Grace in 1987, seeking information on what it considered the "most important pollutant," identifying, "Asbestos associated with your entire operation." After this letter and inspection to Grace, the Department of Health and Environmental Sciences wrote to the EPA for information about the public health risk from asbestos exposure. The State's letter stated, in part, "In permitting the mining, concentrating, and milling of the vermiculite ore, the question of public health risk from asbestos exposure needs to be addressed."

59.     The Montana Department of State Lands was involved in conducting inspections of Grace's Libby mining operations pursuant to its permitting and oversight authority under mine reclamation statutes. (§ 50-1200 et. seq., RCM 1947). The Department of State Lands conducted inspections in 1975, 1979, 1985, 1987, and 1994. Despite knowledge of the health hazard and asbestos content at the mine, the State continued to permit and inspect the Libby mine without taking any action on the problems associated with the asbestos.

60.     The Montana Department of State Lands regularly exercised its permitting and oversight authority of Grace's Libby operations. Beginning in November 1971, the Department of State Lands issued permits to, and received annual operating reports from, WR Grace until 1990. Despite specific knowledge of the asbestos hazard at Grace's Libby mining operation, the Department of State Lands authorized multiple permitting amendments to increase the mine size. In each instance the State determined that no environmental review was required. An environmental review is intended to evaluate impacts on both the environment and human health. The environmental review would have required the State to conduct a thorough analysis of the human health impacts from

the mine, and the public process required by an environmental review would have revealed to the Libby community the impacts on human health from Grace's mining and milling operation.

61.    The Employment Relations Division (ERD) of the Montana Department of Labor an Industry separately tracked and regulated Grace and its Libby operation. The Safety Bureau inspected the Grace mine for compliance with state occupational safety and health codes, and the Workers Compensation Claim Assistance Bureau received notices of claims filed by workers for work-related injury or disease.

62.    Between June 1974 and February 1991, the Department of Labor and Industry conducted no fewer than 20 inspections of Grace's Libby operations. Many of these inspections generated citations and required abatement by Grace. One inspection, in October 1985, was conducted to become familiar with Grace's effort to minimize asbestos exposure to employees. At this same inspection, the State gave a safety presentation to Grace employees addressing back injury prevention and safety glasses. There is no record that the State discussed the asbestos hazard with Grace employees at this presentation. Despite its knowledge of the asbestos hazard at Grace, the Workers Compensation Claim Assistance Bureau reported in 1985 that it was not testing for asbestos based on efforts by federal inspectors to sample asbestos at Grace twice per year, the frequent communication between federal officials and the Safety Bureau, and the access that the State had to federal inspection reports. In addition, the Claims Assistance Bureau administered a number of claims for asbestosis or lung related conditions involving Grace workers.

63.    From 1971-1991, a number of federal agency inspections of the Grace mine and mill showed violations of asbestos dust control requirements. The State of Montana was either a participant in, copied on the reports of, or had access to said inspections. Federal inspections in 1971, 1972, 1973, 1974 and 1975 found dangerous levels of asbestos dust at the Grace mine and mill. The State of Montana did nothing to warn the workers, their families, or the community of the dangers of asbestos disease.

64.    Following the closure of Grace's mine operations in approximately 1990,

the State of Montana continued to inspect the Grace operation for occupational and environmental health hazards.

65. The State had knowledge and notice throughout the period of Plaintiffs' residence in the Libby area that Plaintiffs were within the specific community that was at risk from the asbestos hazard created by Grace's Libby operations.

### FIRST CLAIM
### Negligence v. BNSF (All Plaintiffs)

66. Paragraphs 1-65 above are incorporated by this reference.

67. Plaintiffs resided or remained in proximity to the real property of BNSF and were thereby exposed to asbestos dust from BNSF's property and operations. John Swing was a managing agent for BNSF in Libby, Montana, and as such is separately responsible for acts wrongful in this nature. Allegations herein as to BNSF's conduct and knowledge by this reference specifically include defendant John Swing.

68. Throughout the years of exposure above stated, the Plaintiffs lived in an environment that caused them to be exposed to and to inhale asbestos dust.

69. At all times Plaintiffs were ignorant of the nature and extent of the life threatening risks and injury involved, and would not have continued to remain in such an environment if they had known the true facts.

70. Without knowledge of the nature and extent of the asbestos hazard, Plaintiffs were denied the options of avoiding exposure, demanding dust control or changing residence.

71. At all times BNSF knew or should have known of the asbestos in the vermiculite, and knew or should have known of the hazards to human health of asbestos exposure and had a continuing duty to gather information, to prevent toxic dust from collecting upon and escaping from its property, and to warn Plaintiffs and others who would be harmed by said dust.

72. BNSF was negligent, as follows:

(a) in failing to inquire, study and evaluate the dust hazard to human health;

(b)    in failing to take measures to prevent toxic dust from collecting upon and escaping from its property;

(c)    in failing to warn Plaintiffs of the true nature of the hazardous effects of the dust; and

(d)    by acting in concert with Zonolite/Grace.

73.    As a direct and proximate result of the conduct of BNSF as described above, Plaintiffs suffered from asbestos related bodily injuries, including asbestos related cancers as indicated on Exhibit "A" under the "ARD CA" designation. Some Plaintiffs have died as a result of their asbestos related bodily injuries as indicated on Exhibit "A" under the "Wrongful Death" designation. All Plaintiffs have incurred the damages alleged herein.

## SECOND CLAIM
### Common Law Strict Liability v. BNSF (All Plaintiffs)

74.    Paragraphs 66-73 above are incorporated by this reference.

75.    Defendant BNSF failed to control asbestos contaminated vermiculite used in the operation of their business thereby causing Plaintiffs to be exposed to asbestos, an extra hazardous and abnormally dangerous substance.

76.    Defendant BNSF engaged in abnormally dangerous activities thereby causing the release of asbestos contamination and exposure of Plaintiffs to deadly asbestos. BNSF's business activities in handling, storing, transporting, loading, and using asbestos and asbestos contaminated products were abnormally dangerous in that:

(a)    said business activities created a high degree of prior, present, and continuing contamination in the form of exceedingly toxic asbestos, which created a high degree of risk of harm to Plaintiffs and others;

(b)    there was and is a strong likelihood that the harm resulting from said business activities and exposure to asbestos is great;

(c)    the risk of harm caused by BNSF's storing, handling, transporting, loading, and using asbestos contaminated vermiculite cannot be reasonably eliminated for those humans living and working in proximity to BNSF's abnormally dangerous business activity;

(d)    said business activities are not a matter of common usage;

(e)    BNSF's abnormally dangerous business activities were carried on

within the town of Libby and adjacent areas, which were places that were inappropriate for the release of asbestos contamination; and

(f)     the dangerous attributes of the BNSF's business activities completely outweigh the value of those activities to the community.

77.     The dangers of the BNSF's business activities for the locality where Plaintiff resided, worked, or remained were so great that despite any usefulness of their activities and of the asbestos contaminated vermiculite under its control, BNSF should be required as a matter of law to pay for any harm caused.

78.     BNSF is strictly liable to the Plaintiffs for damages caused by Plaintiffs' exposure to deadly asbestos caused by BNSF's abnormally dangerous business activities.

79.     As a direct and proximate result of the BNSF's abnormally dangerous business activities, Plaintiffs were exposed to unreasonably dangerous and hazardous materials, contracted asbestos related disease, suffered asbestos related bodily injuries, including asbestos related cancers as indicated on Exhibit "A" under the "ARD CA" designation. Some Plaintiffs have died as a result of their asbestos related bodily injuries as indicated on Exhibit "A" under the "Wrongful Death" designation. All Plaintiffs have incurred the damages alleged herein.

## THIRD CLAIM
### Negligence in provision of industrial hygiene services v.
### Maryland Casualty (Plaintiffs designated as "MD Cas." on Exhibit "A")

80.     Paragraphs 1-65 above are incorporated by this reference.

81.     Maryland Casualty provided professional industrial hygiene services to address the safety of the mine and mill work site through what were represented to be competent Safety Engineers and professionals from the Engineering Division and the Medical Division of Maryland Casualty, under the supervision of industrial hygienist L.E. Park.

82.     From its first undertaking at the Mine facility, Park and others in the Accident Prevention Department at Maryland Casualty knew that they "had an outstanding pneumoconiosis occupational disease exposure," and "soon learned that there were 30 employees who lacked normal lung function."

83.     Maryland Casualty knew that the 1959 series of chest x-rays on the Libby workers showed a one-third incidence of abnormal chest x-rays.

84.     Maryland Casualty knew that the 1964-1973 annual series of chest x-rays on the Libby workers showed a 25% plus incidence of abnormal chest x-rays.

85.     Maryland Casualty knew that a 1965 study showed 20% incidence of asbestosis in the Libby workers, with a likely incidence of twice that upon thorough testing.

86.     Maryland Casualty knew or should have known that from 1961 forward, men were dying of asbestos disease, and that each year more became diseased.

87.     Maryland Casualty knew or should have known that there were no showers for workers, no coveralls for workers, and that workers went home and into the community covered with asbestos dust, which was hazardous to all those who might come into contact with it.

88.     As part of its industrial hygiene services, Maryland Casualty's Engineering Division and Medical Division undertook to "engineer this risk," and undertook to design a "program for control and prevention" of asbestos dust and disease for the benefit of workers, their families and the community that would address dust control and personal protection from asbestos dust.

89.     In its provision of industrial hygiene services and its undertaking of industrial hygiene measures, Maryland Casualty had a duty of reasonable care to those (including workers, their families and the community) relying on the fulfillment of safe standards of industrial hygiene, and to those who were in need of disclosure of the nature and degree of the asbestos hazard known to Maryland Casualty.

90.     Maryland Casualty was negligent in their design of the industrial hygiene program, and in failing to disclose and disseminate, to the workers and individuals at risk, the nature and degree of the asbestos hazard Maryland casualty had acquired and analyzed by its industrial hygiene professionals. Maryland Casualty was negligent:

>        (a)     in failing to include sufficient measures for education of workers, in the hazards of asbestos exposure;

(b)   in failing to include measures to warn workers, their families, and the community of the hazards of asbestos exposure;

(c)   in failing to include sufficient measures and standards for dust control through housekeeping, ventilation and exhaust air cleaning;

(d)   in failing to include sufficient measures and standards for maintenance of equipment and premises;

(e)   in failing to include a sufficient medical monitoring program;

(f)   in failing to disclose the nature and degree of the immediate and extreme asbestos hazard known to the professionals at Maryland Casualty;

(g)   in failing to sufficiently test and monitor the effectiveness of dust control at all locations where there was dust;

(h)   in failing to obtain available medical information on the incidence of disease and deaths at the Grace operations including from public agencies; and

(i)   in failing to sufficiently study and use the information on dust control and asbestos disease that it did have.

91.   Maryland Casualty undertook to address industrial hygiene concerns including prescription of warnings and worker education of the asbestos hazard for the mine and mill workers, their families and the community.

92.   Maryland Casualty had a duty of care to the mine and mill workers, their families and to the members of the Libby community to assure that warnings were designed to reasonably inform those at risk:

(a)   of the level of asbestos in the workplace;

(b)   of the hazards of asbestos carried home on workers' clothes;

(c)   of the toxicity of the asbestos and nature and degree of the health hazard and deadly health effects of asbestos inhalation;

(d)   of the hidden nature of the hazard, that its deadly effects operated invisibly and without obvious signs of irritation or harm, and that its latent deadly effects would first manifest many years after what would, to the uneducated layman, would be an apparent innocuous exposure to harmless dust; and

(e)     of the means to limit exposure in the workplace and at home, such as changing and washing procedures that kept work clothes out of the home, and training on where, when and what type of respirator devices needed to be worn to keep the worker safe.

93.     As part of its industrial hygiene services and the creation of a program for control and prevention of asbestos disease, Maryland Casualty failed to design and prescribe the necessary warnings.

94.     Maryland Casualty was negligent in their design of the warning and education aspects of the safety program in that it failed:

(a)     to include sufficient measures for education of workers, in the hazards of asbestos exposure;

(b)     to include sufficient measures for apprising the workers of the high levels of asbestos dust at the worksite;

(c)     to include sufficient warnings and measures to apprise workers of consequences of unprotected exposure to asbestos dust at levels regularly encountered in the workplace;

(d)     to include sufficient measures to warn and apprise workers of the dangers of transporting work clothes to their homes; and

(e)     to include warnings and measures to warn workers, their families and the community of the hazards of asbestos exposure in a manner that met industrial hygiene standards for warnings of a hidden and deadly hazard.

95.     Maryland Casualty's representatives with expertise in industrial hygiene inspected the Grace Libby operations.

96.     In so doing, Maryland Casualty had a duty of reasonable care to the Libby workers, their families and to the community.

97.     Maryland Casualty was negligent in inspection of the Grace Libby operations, in failing to disclose to workers the nature and degree of the hazard and in failing to act upon known hazardous conditions due to insufficient worker education, insufficient warnings to workers, their families and to the community, insufficient dust control (including housekeeping, ventilation, exhaust air cleaning and maintenance), and insufficient medical monitoring.

98.     Plaintiffs worked at the vermiculite mine and Mill in the Libby area and/or lived or recreated in the Libby area and were exposed to and inhaled asbestos dust from the mill operations.

99.     Workers had no coveralls and no showers. As a result, workers including Plaintiffs went home with asbestos dust on their clothing and in their cars, thereby contaminating their homes with asbestos dust, causing the workers and their families to have 24 hour exposure to toxic asbestos fibers.

100.    At all times Plaintiffs were ignorant of the nature and extent of the life threatening risks and injury involved, and would not have continued to live and work in such an environment if they had known the true facts.

101.    Without knowledge of the nature and extent of the asbestos hazard, Plaintiffs were denied the options of avoiding exposure, demanding protective devices, demanding safer operations, changing jobs, and protecting their homes and families.

102.    As a direct and proximate result of Maryland Casualty's negligence in performance of industrial hygiene professional services for the protection of workers and others, including inadequate warnings, inspections and disclosure of known hazards, Plaintiffs suffer from asbestos disease and asbestos related bodily injuries, including asbestos related cancers as indicated on Exhibit "A" under the "ARD CA" designation. Some Plaintiffs have died as a result of their asbestos related bodily injuries as indicated on Exhibit "A" under the "Wrongful Death" designation. All Plaintiffs have incurred the damages alleged herein.

## FOURTH CLAIM
### Bad Faith Treatment of Workers with Rights to Occupational Disease Benefits (Breach of Fiduciary Duty, Deceit, Bad Faith Negligent Misrepresentation and Constructive Fraud, Malice) v. Maryland Casualty (Plaintiffs designated as "MD Workers" on Exhibit "A" attached hereto)

103.    Paragraphs 1- 65 are incorporated by this reference.

104.    Beginning upon Grace's acquisition of the Mine in 1963 through at least June 30, 1973, Maryland Casualty provided for the Mine workers, under Policies R-00590, R-00591, R-00592, et. seq., the disability insurance prescribed by Montana's

Workers' Compensation and Occupational Disease laws.

105.    Maryland Casualty owed duties with respect to workers' rights to occupational disease benefits, including the duties to adjust and pay occupational disease claims for benefits promptly and in good faith, and the duty not to hide or mislead workers about the facts of their exposure to asbestos, the course of latent asbestos disease process, or other facts relating to their entitlement to occupational disease benefits.

106.    Apart and distinct from any liability insurance for conduct of W.R. Grace, during the period 1962-1973, Maryland Casualty contracted to provide workers compensation/occupational disease coverage to employees under statutorily defined "compensation plan No. 2," which required that Maryland Casualty "shall be directly and primarily liable to and will pay directly to the employee" the compensation owed under the Montana Occupational Disease Act (herein MODA).

107.    There was a special relationship between Maryland Casualty and the workers that arose out of its contractual and statutory duty to be directly liable for occupational disease benefits. This special relationship arises from:

(a)    inherently unequal positions of control and knowledge over disease-causing asbestos dust problem, and knowledge of the workers' "disease" and "injurious exposure" within the meaning of MODA;

(b)    the workers' special vulnerability because of the harm they may suffer to their right to benefits for disability and/or medical expenses;

(c)    the workers' need to place trust in Maryland Casualty in its communication of asbestos disease hazards, injurious exposures to asbestos, and incidence and likelihood of asbestos-related disease, all known to Maryland Casualty, especially because of the hidden, insidious, and latent nature of asbestos injury;

(d)    Maryland Casualty's awareness of this vulnerability, need and trust;

(e)    the workers losing their right to pursue their employer for tort liability as a quid pro quo for the protection of benefits under MODA; and

(f)    the workers being subject to time limitations for presenting claims for occupational disease benefits following injurious exposure.

108. Because of the above-described special relationship, Maryland Casualty had a fiduciary duty to disclose and not to suppress information necessary to the insured employees' rights as injured workers with injurious exposures and, therefore, their rights to occupational disease benefits for latent disease.

109. This fiduciary duty is further defined and heightened by Maryland Casualty's industrial hygiene control over the design of the safety program and the absence of reasonable warning therein, its conduct of workplace inspections, and by its control of information that should be communicated to the workers.

110. This fiduciary duty is further defined and heightened by MCC's actual knowledge of a serious dust, health and occupational disease "claim" problem at the Libby facility, and the effect thereof on the workers' health and their health and disability benefit needs.

111. Maryland Casualty knew that the 1959 series of chest x-rays on the Libby workers showed a one-third incidence of abnormal chest x-rays.

112. Maryland Casualty knew that the 1964-1973 annual series of chest x-rays on the Libby workers showed a 25% plus incidence of abnormal chest x-rays.

113. Maryland Casualty knew that a 1965 study showed 20% incidence of asbestosis in the Libby workers, with a likely incidence of twice that upon thorough testing.

114. Maryland Casualty knew or should have known that from 1961 forward, men were dying of asbestos disease, and that each year more became diseased.

115. Maryland Casualty failed to disclose and suppressed the knowledge of the fact, degree and expected consequences of the asbestos hazard. Its safety program failed to provide for worker education and warnings, and it failed to report to the workers known and ongoing hazardous conditions. Maryland Casualty concealed the expected course of latent disease process in workers. Further, Maryland Casualty knew that workers were being advised that the dust was not dangerous, and that workers were not aware of the extreme asbestos dust concerns raised in reports of periodic inspections by the Montana State Board of Health.

116.    Maryland Casualty knew that the workers would not be alerted to the occupational disease hazard of asbestos or the resulting occupational disease benefit entitlement because (a) the workers were not apprised of the presence of asbestos toxin in the apparently benign workplace dust; (b) the workers were not apprised that asbestos levels at the mine and mill far exceeded standards of danger for workplace exposure; and (c) asbestos hazard is hidden and insidious, has no irritant or odor signal of health hazard, has no immediate symptomological manifestation, and has a lengthy period of latency.

117.    Maryland Casualty's non-disclosure and suppression of facts was done in order to hide from the workers the nature and degree of the hazard and the fact that workers had rights to occupational disease benefits for their injurious exposures under MODA which Maryland Casualty would owe a direct duty to pay. With asbestosis experienced at a rate of 41.5% of workers with over 10 years of service, and lung disease at a rate of 92% of workers with 21-25 years of service, Maryland Casualty faced enormous cost of medical and/or disability benefit claims.

118.    Maryland Casualty's knowledge of, and motive with respect to, the impact of the suppressed facts on occupational disease claims included a November 25, 1967 letter to Maryland Casualty from the attorney it retained to defend the MODA claim of Zonolite worker Lilas D. Welch.

119.    Suppressed and undisclosed facts included that: "a great many of [Maryland Casualty's] insured's employees suffer from lung abnormalities;" the fact that asbestos fibers in "the dust in the mill did far exceed what were considered to be allowable concentrations"; the fact that asbestos fibers in "the dust in the mill did far exceed what were considered to be allowable concentrations;" the fact that not only the mill but "the entire yard area may subject workmen to what might be termed to be 'injurious exposure'" under MODA.

120.    The suppression and nondisclosure of facts was motivated by Maryland Casualty's realization that it had "a severe problem, and that [it] might expect a good many claims involving asbestosis."

121.    Actions to conceal these facts include the suppression of radiologist studies

where revelation of the studies "would reveal the extent and severity of the problem."

122.    Maryland Casualty's knowledge of the hidden nature of the facts is reflected in the rationale of, and formed the basis of, a plan to keep Montana State Board of Health reports "out of the hands of the Industrial Accident Board," and "avoiding the necessity of exposure of all the more damaging aspects of our own situation."

123.    Maryland Casualty sought to avoid disclosure to the Montana Industrial Accident Board, the entity charged with addressing compensability of occupational disease claims, the facts of the degree of disease-causing asbestos-laden dust in order to avoid Maryland Casualty's liability on existing claims, the expected "good many claims involving asbestosis," as well as the future liability for benefits for workers with latent disease.

124.    Plaintiffs' right to occupational disease benefits for their injurious exposure was lost after the expiration of the prescribed period for presentation of a claim for benefits and before they had knowledge that they had sustained an injurious exposure to occupational disease qualifying for benefits under MODA.

125.    Maryland Casualty's conduct constituted a breach of its fiduciary duties as a workers compensation and occupational disease insurer of workers including Plaintiffs.

126.    Maryland Casualty's conduct constituted deceit within the meaning of 27-1-712, M.C.A. and Plaintiffs were misled thereby.

127.    Maryland Casualty's conduct constituted bad faith and a breach of the duty of good faith and fair dealing.

128.    Maryland Casualty's conduct constituted constructive fraud within the meaning of 28-2-406, M.C.A., and negligent misrepresentation.

129.    As a proximate result of Maryland Casualty's breach of duties described above, Plaintiffs lost the opportunity to timely present a claim for occupational disease benefits, lost the opportunity to receive payment for asbestos-related medical expenses and disability benefits, and, as a result, sustained and will sustain economic losses of hundreds of thousands of dollars.

130.    Maryland Casualty's conduct described in this count constituted malice

such that Plaintiffs are entitled to an assessment of punitive damages sufficient to punish, deter and make example of such malicious conduct.

## FIFTH CLAIM
### Negligence v. CNA
### (Plaintiffs designated "CNA" on Exhibit "A" attached hereto)

131. All paragraphs above are incorporated by this reference.

132. CNA, through Continental Casualty Co., was the workers' compensation carrier for W.R. Grace from July 1, 1973 to July 1, 1976. CNA, through Transportation Ins. Co. or Continental Casualty Co., was the workers' compensation carrier for W.R. Grace from July 1, 1976 to 1996.

133. CNA's professional staff included industrial hygienists and medical doctors with expertise in occupational disease. At all times CNA was well aware of the hazards of asbestos exposure.

134. At all times, CNA knew of the asbestos exposure at the Grace Libby operations, and that workers were diseased and dying from asbestos exposure, and that a hazardous condition existed.

135. CNA knew or should have known that there were no showers for workers, no coveralls for workers, and that workers went home and into the community covered with asbestos dust, which was hazardous to all those who might come into contact with it.

136. CNA undertook to provide industrial hygiene services for the benefit of Grace employees, their families and the community.

137. In so doing, CNA had a duty of care to the Libby workers, their families and to the community.

138. CNA was negligent in this undertaking to provide services:

(a)     in failing to recommend or require sufficient measures and standards for employee education, warning the workers, their families and the community, protection against asbestos dust going into workers' homes and into the community, dust control (including housekeeping, ventilation, exhaust air cleaning and maintenance) and medical monitoring;

(b)     in failing to sufficiently test and monitor the effectiveness of dust control at all locations where there was dust;

(c)     in failing to obtain medical information on the incidence of disease
        and deaths at the Grace operations from Grace and from public
        agencies; and

(d)     in failing to sufficiently study and use the information on dust
        control and asbestos disease that it did have.

139.    CNA's representatives with expertise in industrial hygiene inspected the
Grace Libby operations.

140.    In so doing, CNA had a duty of reasonable care to the Libby workers, their
families and to the community.

141.    CNA was negligent in inspection of the Grace Libby operations, in failing
to report and act upon known hazardous conditions due to insufficient worker education,
insufficient warnings to workers, their families and to the community, insufficient dust
control (including housekeeping, ventilation, exhaust air cleaning and maintenance), and
insufficient medical monitoring.

142.    As a direct and proximate result of the negligence of CNA, Plaintiffs suffer
from asbestos disease and asbestos related bodily injuries, including asbestos related
cancers as indicated on Exhibit "A" under the "ARD CA" designation.  Some Plaintiffs
have died as a result of their asbestos related bodily injuries as indicated on Exhibit "A"
under the "Wrongful Death" designation.  All Plaintiffs have incurred the damages
alleged herein.

### SIXTH CLAIM
### Negligence v. Robinson Insulation (all Plaintiffs)

143.    All paragraphs above are incorporated by this reference.

144.    For many years, Defendant Robinson Insulation obtained asbestos
contaminated vermiculite from Libby, Lincoln County, Montana.  Said asbestos
contaminated vermiculite was transported by rail from Lincoln County to Great Falls,
Cascade County, Montana, where Defendant Robinson Insulation expanded the asbestos
contaminated vermiculite and processed it into various manufactured products.

145.    After expanding the deadly asbestos contaminated vermiculite and
processing it into manufactured products, Robinson Insulation sold said vermiculite and

vermiculite products to the J. Neils/St. Regis Champion lumbermill in Libby and to others for use and for resale in Libby, Montana. Said expanded vermiculite and vermiculite products were transported from Great Falls back to Libby and delivered to the said lumbermill and to other sites in Libby.

146.    Plaintiffs were exposed to Defendant Robinson Insulation's unreasonably dangerous asbestos contaminated products, which Robinson Insulation wrongfully placed in the stream of commerce for use and consumption by the general public.

147.    During Plaintiffs' period of exposure to asbestos and contaminated vermiculite, which was generated and released by Robinson Insulation's business activities, Robinson Insulation knew that extended exposure to asbestos was unreasonably dangerous and hazardous to an individual's health. Nevertheless, Robinson Insulation concealed and failed to disclose such knowledge to their employees, the public, and the Plaintiffs. Robinson Insulation gave no indication that it was unsafe and in fact a serious health hazard for Plaintiffs to be exposed to asbestos generated and released by Robinson Insulation's business activities. Plaintiffs were at all times ignorant of the nature and extent of the life threatening risk involved in exposure to the asbestos generated and released by Defendant's business activities.

148.    Robinson Insulation owed the Plaintiffs a duty to act with reasonable care concerning their business operations, so as not to jeopardize their health and welfare from exposure to its asbestos contamination and asbestos products.

149.    Robinson Insulation breached its duty of care by negligently, carelessly, and recklessly generating, handling, storing, releasing, disposing of, and failing to control and contain unreasonably dangerous and hazardous asbestos created by and/or resulting from its for profit business operations.

150.    Although Robinson Insulation knew or had ample reason to know that its acts or omissions created a high degree of harm to the Plaintiffs, it nevertheless deliberately acted in conscious disregard of and indifference to the risk imposed upon the Plaintiffs by their continued exposure to asbestos.

151.    As a direct and proximate result of Plaintiffs' exposure to asbestos-laced

vermiculite generated and released by Robinson Insulation's business activities, Plaintiffs suffer from asbestos disease and asbestos related bodily injuries. Plaintiffs suffer from asbestos disease and asbestos related bodily injuries, including asbestos related cancers as indicated on Exhibit "A" under the "ARD CA" designation. Some Plaintiffs have died as a result of their asbestos related bodily injuries as indicated on Exhibit "A" under the "Wrongful Death" designation. All Plaintiffs have incurred the damages alleged herein.

**SEVENTH CLAIM**
**Strict Products Liability v. Robinson Insulation (all Plaintiffs)**

152.    All paragraphs above are incorporated by this reference.

153.    At times relevant to this action, Defendants Robinson Insulation was engaged in the business of manufacturing, fabricating, modifying, expanding, labeling, distributing, supplying, selling, marketing, packaging, and/or advertising multiple products containing vermiculite. Said vermiculite was laced with deadly asbestos.

154.    Defendant Robinson Insulation knew and intended that the above referenced vermiculite and asbestos contaminated products would be used without inspection for defects therein or in any of their component parts and without knowledge of the hazards involved in such use.

155.    Defendant Robinson Insulation distributed and/or sold said asbestos-laced vermiculite products to the public, to the Plaintiffs, and to one or more of Plaintiffs' employers.

156.    Said asbestos-laced vermiculite products were defective and unreasonably dangerous for their intended purpose in that the inhalation of asbestos fibers causes serious disease and/or death to humans. The defect existed in the said products at the time they left the possession of Defendant Robinson Insulation. Said products did, in fact, cause injury and damage to Plaintiffs, while being used in a reasonably foreseeable manner, thereby rendering the same defective, unsafe, and unreasonably dangerous for use.

157.    Plaintiffs did not know of the substantial danger of using said asbestos-laced vermiculite products, nor was said danger readily recognizable by them. Defendant

Robinson Insulation further failed to adequately warn of the risk of contamination to which Plaintiffs were exposed.

158. As a direct and proximate result of the unlawful actions of Defendant Robinson Insulation and as a direct and proximate result of exposure to Robinson Insulation's unreasonably dangerous asbestos contaminated vermiculite products, Plaintiffs suffer from asbestos disease and asbestos related bodily injuries. Some Plaintiffs have died as a result of their asbestos related bodily injuries as indicated on Exhibit "A" attached hereto. Plaintiffs suffer from asbestos disease and asbestos related bodily injuries, including asbestos related cancers as indicated on Exhibit "A" under the "ARD CA" designation. Some Plaintiffs have died as a result of their asbestos related bodily injuries as indicated on Exhibit "A" under the "Wrongful Death" designation. All Plaintiffs have incurred the damages alleged herein.

**EIGHTH CLAIM**
**Wrongful Death v. BNSF, Maryland Casualty, CNA and Robinson Insulation**
**(Plaintiffs so designated under "Wrongful Death" on Exhibit "A" attached hereto)**

159. All paragraphs above are incorporated by this reference.

160. As a direct and proximate result of the actions of the Defendants as alleged above, some Plaintiffs have died as a result of their asbestos related bodily injuries as designated under "Wrongful Death" on Exhibit "A" attached hereto. The heirs of the aforesaid deceased Plaintiffs have suffered the loss of the deceased Plaintiff, their society, care, comfort and support and have incurred damages as alleged herein.

**NINTH CLAIM**
**Does A-Z**

161. All paragraphs above are incorporated by this reference.

162. Does A-Z are corporations or persons unknown at this time whose negligence and wrongful acts caused asbestos disease in the Plaintiffs. Plaintiffs will seek to amend their complaint when the true names and capacities of Does A-Z are ascertained.

**DAMAGES**

163. All paragraphs above are incorporated by this reference.

164.   As a direct and proximate result of the acts of the Defendants, the Plaintiffs have suffered and will suffer:

   a.   Loss of enjoyment of established course of life;
   b.   Loss of services which can no longer be performed;
   c.   Loss of earnings and/or earning capacity;
   d.   Physical, mental and emotional pain and suffering;
   e.   Medical expenses, rehabilitation expenses and related expenses;
   f.   Loss of insurability for medical coverage;
   g.   Loss of medical and disability benefits under MODA;
   h.   Great grief and sorrow; and
   i.   The heirs of those Plaintiffs having died as a result of their asbestos related bodily injuries have lost the care, comfort and society of said Plaintiffs and have suffered other damages.

## PRAYER FOR RELIEF

WHEREFORE, the Plaintiffs pray for damages against the Defendants as follows:

1.   Reasonable damages for lost enjoyment of established course of life, past and future;

2.   Reasonable damages for loss of services which can no longer be performed;

3.   Reasonable damages for physical, mental and emotional pain and suffering, past and future;

4.   Reasonable damages for medical expenses, rehabilitation expenses, and related expenses incurred to date and reasonably certain to be incurred in the future;

5.   On behalf of those so injured, the Personal Representative prays for distinct and separate assessment and recovery of reasonable damages for the heirs' loss of the care, comfort, society and support of the deceased by reason of the wrongful death of their loved one;;

6.   Advance payment of past and present medical expenses and special damages not reasonably in dispute;

7.   Reasonable damages for loss of earnings and/or earning capacity;

8.   Reasonable damages for grief and sorrow;

9.   For costs of suit;

10.   For punitive damages; and

11.   For such further relief as is just and equitable under the circumstances.

## DEMAND FOR TRIAL BY JURY

Plaintiffs hereby demand a trial by jury.

DATED this _22nd_ day of September, 2016.

McGARVEY, HEBERLING, SULLIVAN
& LACEY, P.C.

By: _____
ROGER SULLIVAN
ALLAN McGARVEY
JOHN F. LACEY
Attorneys for Plaintiffs

Exhibit "A"   Aarstad et al v BNSF et al

| Last Name | First Name | Middle | ARD CA | Wrongful Death | MD Case | CNA | BNSF | MD Worker |
|---|---|---|---|---|---|---|---|---|
| Aarstad | Korey | L | | | Yes | Yes | Yes | |
| Albert | Scott | A | | | Yes | Yes | Yes | |
| Anderson | Mark | D | | | No | Yes | Yes | |
| Anderson | David | B | | | Yes | Yes | Yes | |
| Anderson | Albert | C | | | Yes | Yes | Yes | |
| Ashley, Jr | Charles | H | | | No | Yes | Yes | |
| Bache | John | E | | | Yes | Yes | Yes | |
| Bache - PR Glenda Larson | Cecil | F | | Yes | Yes | No | Yes | |
| Backen | Linda | J | Yes | | Yes | No | Yes | |
| Backen | Daniel | P | | | Yes | Yes | Yes | |
| Baeth | Randall | W | | | Yes | Yes | Yes | |
| Barnett | Richard | D | | | No | No | Yes | |
| Bass | Gerald | L | | | Yes | Yes | Yes | |
| Bibb | Douglas | K | | | Yes | Yes | Yes | Yes |
| Black | Donna | M | | | No | Yes | Yes | |
| Blixt | Jimmy | R | | | Yes | Yes | Yes | |
| Boursaw | Shelley | A | | | Yes | Yes | Yes | |
| Braaten | Rhonda | R | Yes | | Yes | Yes | Yes | |
| Bredeson | Glenn | L | | | No | Yes | Yes | |
| Brese - PR Jack Brese | Darlene | K | | Yes | Yes | No | Yes | |
| Brooks | Michael | E | | | Yes | Yes | Yes | Yes |
| Brossman | Daniel | W | | | Yes | Yes | Yes | |
| Brossman | Hazel | M | | | Yes | Yes | Yes | |
| Brown | Douglas | L | | | Yes | Yes | Yes | |
| Brus | Kirk | C | | | Yes | Yes | Yes | |
| Bulkus | Robbin | R | | | Yes | Yes | Yes | |
| Butler | James | E | | | Yes | Yes | Yes | |
| Calloway | Larry | L | | | Yes | Yes | Yes | |
| Camp | Joseph | G | | | Yes | Yes | Yes | |
| Campbell - PR Joseph Campbell | Hermine | M | | Yes | Yes | Yes | Yes | |
| Carabin, Sr | James | T | | | Yes | Yes | Yes | Yes |
| Carlock | John | E | | | Yes | Yes | Yes | |
| Carpenter | Betsy | E | | | Yes | Yes | Yes | |
| Carr | Gordon | V | | | Yes | Yes | Yes | |
| Carr | Cheri | L | | | Yes | Yes | Yes | |
| Carroll | Violet | M | | | No | No | Yes | |
| Cassel | Keith | | | | Yes | Yes | Yes | |
| Chapel | David | L | | | Yes | Yes | Yes | |
| Choate | Ruth | A | | | No | Yes | Yes | |
| Christensen | Wendy | D | | | Yes | Yes | Yes | |
| Coldiron | Brian | L | | | Yes | Yes | Yes | |
| Coleman | Robert | A | | | Yes | No | Yes | |
| Craigmile | Katherine | M | | | Yes | Yes | Yes | |
| Crismore | Stuart | G | | | Yes | Yes | Yes | |
| Croucher | Kurt | C | | | Yes | Yes | Yes | |
| Curtiss | Cymon | A | | | Yes | Yes | Yes | |

| Last Name | First Name | Middle | WARD CA | Wrongful Death | MD Case | CNA | BNSF | MD Worker |
|---|---|---|---|---|---|---|---|---|
| Day | Robert | L | | | Yes | Yes | Yes | |
| Dentlinger | Roxann | L | | | Yes | Yes | Yes | |
| Doney | David | L | | | Yes | Yes | Yes | |
| Dorrington | Linda | L | | | Yes | Yes | Yes | |
| Dotson | Todd | A | | | Yes | Yes | Yes | |
| Drake | Kenneth | L | | | Yes | Yes | Yes | |
| Edwards | Sheri | A | | | Yes | Yes | Yes | |
| Engebretson | Robert | C | | | Yes | Yes | Yes | Yes |
| Evans | Kelly | W | | | Yes | No | Yes | |
| Farnes | Rhonda | S | | | Yes | No | Yes | |
| Ferch | Debra | J | | | Yes | Yes | Yes | |
| Foote | Ronald | A | | | Yes | Yes | Yes | |
| Fore | Alton | O | | | Yes | Yes | Yes | |
| Fox | Ralph | E | | | No | Yes | Yes | |
| Funk - PR Alvin Funk | Anita | F | | Yes | No | No | Yes | |
| Ginger | Dale | L | | | No | Yes | Yes | |
| Godsey | Kristine | A | | | Yes | Yes | Yes | |
| Gostnell | Joseph | A | · | | Yes | Yes | Yes | |
| Gullingsrud | Rick | L | | | Yes | Yes | Yes | |
| Hartmann | Wayne | W | | | Yes | Yes | Yes | |
| Haywood | Dianna | L | | | No | Yes | Yes | |
| Hefty | Joel | B | | | Yes | No | Yes | |
| Hoffman | Jeanette | H | | | Yes | Yes | Yes | |
| Javorsky | Cheri | L | | | Yes | Yes | Yes | |
| Javorsky | Robert | J | | | No | Yes | Yes | |
| Jellesed | Ramona | J | | | Yes | Yes | Yes | |
| Johnson | Jimmy | D | | | Yes | Yes | Yes | |
| Johnson | Melody | L | | | Yes | Yes | Yes | |
| Johnson - PR Brenda Neuman Brunscher | Orville | D | | Yes | Yes | Yes | Yes | Yes |
| Kelley | Darald | E | | | Yes | Yes | Yes | |
| Kenelly | Sandra | S | | | Yes | Yes | Yes | |
| Kingery | David | A | | | Yes | Yes | Yes | |
| Kiln | Benjamin | F | | | No | Yes | Yes | |
| Koskela | Lynn | M | | | Yes | Yes | Yes | |
| Koskela | Leonard | H | | | Yes | Yes | Yes | |
| LaBelle | Bradley | L | | | Yes | Yes | Yes | |
| Lampton | Lee | S | | | Yes | Yes | Yes | |
| Lampton | Linda | L | | | No | Yes | Yes | |
| Leir | Sidney | L | | | No | No | Yes | |
| Leim | David | L | | | Yes | Yes | Yes | |
| Loomis | Deborah | K | | | Yes | Yes | Yes | |
| Madison | Steven | R | | | Yes | Yes | Yes | |
| Magone | Terry | D | | | Yes | Yes | Yes | |
| Maile | Sandra | J | | | Yes | Yes | Yes | |
| Masterson | Linda | A | | | Yes | Yes | Yes | |
| McDonald | David | D | | | Yes | Yes | Yes | |

| Last Name | First Name | Middle | ARD CA | Wrongful Death | MD Cas. | CNA | BNSF | MD Worker |
|---|---|---|---|---|---|---|---|---|
| McNulty | Roberta | J | | | Yes | Yes | Yes | |
| Molinelli | Margaret | A | | | No | Yes | Yes | |
| Munro | Norma | T | | | Yes | Yes | Yes | |
| Munson | Sharon | L | | | Yes | Yes | Yes | |
| Murch | Sandra | D | | | Yes | No | Yes | |
| Nelson | Shayne | A | | | Yes | Yes | Yes | |
| Neubauer | Kevin | R | | | Yes | Yes | Yes | |
| Nixon | Shirley | M | | | Yes | Yes | Yes | |
| Noble | Scott | N | | | No | Yes | Yes | |
| Nosler | Paulette | D | | | Yes | Yes | Yes | |
| O'Brien | Patrick | H | | | Yes | Yes | Yes | |
| O'Brien | Drilda | J | | | Yes | Yes | Yes | |
| Olsen | Mark | D | | | Yes | Yes | Yes | |
| Olson | Wade | L | | | Yes | Yes | Yes | |
| O'Neill | John | M | | | Yes | Yes | Yes | |
| Orsborn | Carl | L | | | Yes | Yes | Yes | Yes |
| Osborne | Lyndeen | J | | | Yes | Yes | Yes | |
| Parker | Michael | J | Yes | | Yes | Yes | Yes | |
| Pennock - PR Alfred Pennock | Betty | L | | | Yes | Yes | Yes | |
| Phillips | Greg | W | | | Yes | Yes | Yes | |
| Phillips | Dale | B | | | Yes | Yes | Yes | |
| Posselt | Wayne | B | | | No | Yes | Yes | |
| Powers, Sr | James | M | | | No | Yes | Yes | |
| Price | A. Tony | | | | Yes | Yes | Yes | |
| Quinn | Dennis | G | | | Yes | Yes | Yes | |
| Quinn | Daniel | K | | | Yes | Yes | Yes | |
| Randall | Allan | V | | | Yes | Yes | Yes | |
| Randall | Alvin | G | | | Yes | Yes | Yes | |
| Rayson | Clayton | R | | | Yes | Yes | Yes | |
| Rayson - PR to be ?? | Pat | N | | Yes | Yes | Yes | Yes | |
| Richard | Steven | J | | | No | Yes | Yes | |
| Roberts | Joellen | | | | Yes | Yes | Yes | |
| Robins | Todd | E | | | Yes | Yes | Yes | |
| Robins | Gerald | D | | | Yes | Yes | Yes | |
| Roose | June | J | | | Yes | Yes | Yes | |
| Root | Valerie | D | | | Yes | Yes | Yes | |
| Rose | Claire | C | Yes | | Yes | No | Yes | |
| Rowberry - PR Clarise Rowberry | William | R | | | Yes | Yes | Yes | |
| Ruff | Peggy | S | | | Yes | Yes | Yes | |
| Ryan | Patrick | H | | | Yes | Yes | Yes | |
| Sailer | Rebecca | J | | | Yes | No | Yes | |
| Saracino | Salvador | F | Yes | | No | Yes | Yes | |
| Sather | Marvin | C | | | Yes | Yes | Yes | |
| Scharen | Kathleen | E | | | Yes | Yes | Yes | |
| Schauss | Dietmar | G | | | Yes | Yes | Yes | |

| Last Name | First Name | Middle | ARD CA | Wrongful Death | MD Ceas | CNA | BNSF | MD Worker |
|---|---|---|---|---|---|---|---|---|
| Schiele - PR to be ?? | Harold | L | | | Yes | Yes | Yes | |
| Shelton | Jeffrey | M | | | Yes | Yes | Yes | |
| Shoemaker | Leonard | K | | | Yes | Yes | Yes | |
| Sikes | Betty | A | | | Yes | Yes | Yes | |
| Skranak | David | W | Yes | | Yes | Yes | Yes | |
| Slater | Florence | E | | | Yes | Yes | Yes | |
| Smith - PR Calvin Smith | Donald | Ray | | Yes | Yes | No | Yes | Yes |
| Stamper | Brenda | S | | | Yes | Yes | Yes | |
| Steiger - PR Tami M. Stelger | Terry | L | | | Yes | Yes | Yes | |
| Stevens | Timber | K | | | No | Yes | Yes | |
| Stewart | Ellis | D | | | Yes | Yes | Yes | |
| Stubbs | Glenn | N | | | Yes | Yes | Yes | |
| Sundt | Melvin | G | | | Yes | No | Yes | |
| Swearingen | Thomas | V | | | No | Yes | Yes | |
| Swimley | Hugh | E | Yes | | Yes | No | Yes | |
| Switzer | Lee Ann | | | | Yes | Yes | Yes | |
| Torgison | Daniel | W | | | Yes | Yes | Yes | |
| Van Alstine | Betty | R | | | Yes | Yes | Yes | |
| Van Alstine | G. Michael | | | | Yes | No | Yes | |
| Vinion | Betty | F | | | Yes | No | Yes | |
| Volkenand | Julie | A | | | Yes | Yes | Yes | |
| Walen | Lana | M | | | Yes | Yes | Yes | |
| Welcome | Debbra | K | | | Yes | Yes | Yes | |
| West | Sue | C | | | Yes | Yes | Yes | |
| West | George | L | | | Yes | Yes | Yes | |
| Weston - PR Melba Weston | Edwin | B | Yes | Yes | Yes | Yes | Yes | |
| Whitehouse | Sara | A | | | No | Yes | Yes | |
| Wilburn | Robert | D | | | Yes | Yes | Yes | Yes |
| Wiley | Larry | J | | | No | Yes | Yes | |
| Williams | David | M | | | No | Yes | Yes | |
| Winn | Clarence | J | | | No | Yes | Yes | |
| Wise | Harold | M | | | Yes | Yes | Yes | |
| Weller | Judy | M | | | Yes | Yes | Yes | |
| Youso | Patrick | J | | | Yes | Yes | Yes | |
| Zwang | David | J | | | Yes | Yes | Yes | Yes |
| Kelley | Peggy | A | Yes | | No | Yes | Yes | |
| Stineback | Mary | A | Yes | | Yes | Yes | Yes | |
| Riddle | Steven | J | | | Yes | Yes | Yes | |
| Thompson | Thomas | D | | | Yes | Yes | Yes | |
| Parker | Jessie | M | | | Yes | Yes | Yes | |
| Messick | Rebecca | N | | | Yes | Yes | Yes | |
| McNulty | Greg | | | | Yes | Yes | Yes | |
| Magone | Steven | R | | | Yes | Yes | Yes | |

| Last Name | First Name | Middle | ARD CA | Wrongful Death | MD Cas. | CNA | BNSF | MD Worker |
|-----------|-----------|--------|--------|----------------|---------|-----|------|-----------|
| Lockwood | Carol | A | | | No | Yes | Yes | |
| Lockwood | Grover | W | | | No | Yes | Yes | |
| Koskela | Shirley | Y | | | Yes | Yes | Yes | |
| Hunter | Clarence | | | | Yes | No | Yes | |
| Dodge | Suzanne | | | | Yes | Yes | Yes | |
| Dodge | Mark | D | | | Yes | Yes | Yes | |
| Decker | Wesley | M | | | Yes | Yes | Yes | |
| Collins | Delbert | L | | | No | Yes | Yes | |
| Clairmont | Michael | J | | | Yes | Yes | Yes | |
| Chapman | Michael | D | | | Yes | Yes | Yes | |
| Chamberlain | Debra | K | | | Yes | Yes | Yes | |
| Knowles | Sammy | L | | | No | Yes | Yes | |

Roger Sullivan
Allan M. McGarvey
John F. Lacey
McGarvey, Heberling, Sullivan & Lacey, P.C.
345 First Avenue East
Kalispell, MT 59901
(406) 752-5566

Attorneys for Plaintiffs

OF DISTRICT COURT

2017 FEB 28  AM 9: 55

FILED

BY _____
DEPUTY

MONTANA EIGHTH JUDICIAL DISTRICT, CASCADE COUNTY

| | |
|---|---|
| KOREY L. AARSTAD, et al, <br><br> Plaintiffs, <br> v. <br><br> BNSF RAILWAY COMPANY, a Delaware corporation; JOHN SWING; MARYLAND CASUALTY COMPANY, a Maryland Corporation; CNA INSURANCE COMPANIES, a corporation; CONTINENTAL CASUALTY COMPANY, a corporation; TRANSPORTATION INSURANCE COMPANY, a corporation; ROBINSON INSULATION COMPANY, a Montana Corporation for profit; and DOES A-Z, <br><br> Defendants. | **CAUSE NO. DDV-16-0785** <br><br><br><br><br> **NOTICE OF DISMISSAL WITHOUT PREJUDICE AND RESERVATION OF RIGHTS** |

COME NOW, Plaintiffs by counsel, and enter this Notice of Dismissal Without Prejudice of the claims against Defendants CNA Insurance Companies, Continental Casualty Company and Transportation Insurance Company, collectively identified as the "CNA Defendants."

Plaintiffs' causes of action against all other named Defendants and any entities other than CNA Defendants are expressly preserved in this action by Plaintiffs.

The Court is hereby notified that any and all pleadings filed in this case from this point forward will no longer include the CNA Defendants as a named party.



Notice of Dismissal Without Prejudice and Reservation of Rights                    1

**EXHIBIT B**

DATED this 24th day of February, 2017.

McGARVEY, HEBERLING, SULLIVAN
& LACEY, P.C.

By: _____
JOHN F. LACEY
Attorney for Plaintiffs

Chad M. Knight
Anthony M. Nicastro
Nadia Patrick
Steven T. Williams
KNIGHT NICASTRO, LLC
519 Southwest Blvd.
Kansas City, MO 64108
Email:  knight@knightnicastro.com
            nicastro@knightnicastro.com
            npatrick@knightnicastro.com
            williams@knightnicastro.com
Telephone: (816) 853-9845
Facsimile: (303) 845-9299
**ATTORNEYS FOR DEFENDANT**
**BNSF RAILWAY COMPANY**

CLERK OF DISTRICT COURT
FAYE MCWILLIAMS

17 AUG -4  PM 1:53

FILED

BY_____
            DEPUTY

## MONTANA EIGHTH JUDICIAL DISTRICT COURT
## CASCADE COUNTY

| | |
|---|---|
| KOREY L. AARSTAD, et al. ) | Cause No. DV-16-785 |
| ) | |
| PLAINTIFF, ) | |
| ) | |
| VS. ) | **ENTRY OF APPEARANCE ON** |
| ) | **BEHALF OF BNSF RAILWAY** |
| BNSF RAILWAY COMPANY, a ) | **COMPANY AND JOHN SWING** |
| Delaware corporation; JOHN SWING; ) | |
| MARYLAND CASUALTY COMPANY, ) | |
| a Maryland Corporation; CNA ) | |
| INSURANCE, a corporation; ) | |
| CONTINENTAL CASUALTY ) | |
| COMPANY, a corporation; ) | |
| TRANSPORTATION INSURANCE ) | |
| COMPANY; a corporation; ROBINSON ) | |
| INSULATION COMPANY, a Montana ) | |
| corporation for profit; and DOES A-Z. ) | |
| ) | |
| DEFENDANTS. ) | |
| ) | |

COME NOW Chad M. Knight, Anthony M. Nicastro, Nadia Patrick and Steven Williams

of Knight Nicastro, L.L.C. and hereby enter their appearance on behalf of Defendant, BNSF

Railway Company, in the above-entitled matter[1]:

---
[1] See Attached Plaintiff's Exhibit A to their Complaint regarding additional Plaintiff's to this matter.

**EXHIBIT C**

Chad M. Knight
Anthony M. Nicastro
Nadia Patrick
Steven T. Williams
KNIGHT NICASTRO, LLC
519 Southwest Blvd.
Kansas City, MO 64108
Email:  knight@knightnicastro.com
          nicastro@knightnicastro.com
          npatrick@knightnicastro.com
          williams@knightnicastro.com
Telephone: (816) 853-9845
Facsimile: (303) 845-9299

**KNIGHT NICASTRO, L.L.C.**

By: _____

CHAD M. KNIGHT (MT#12678)
ANTHONY M. NICASTRO (MT#9964)
NADIA PATRICK (MT#37722859)
STEVEN T. WILLIAMS (MT#11980)

**ATTORNEYS FOR DEFENDANT**
**BNSF RAILWAY COMPANY**

## CERTIFICATE OF SERVICE

I hereby certify that the original of the foregoing was delivered to the Clerk of District

Court and upon the following counsel via United States Postal Service, postage prepaid, on this

31st  day of July, 2017:

John F. Lacey
Roger Sullivan
Allan M. McGarvey
345 First Avenue East
Kalispell, MT 59901
(406) 752-5566
*Attorneys for Plaintiff*

_____
CHAD M. KNIGHT

| LastName | FirstName | MI | AFD CA | Wrongful Death | MTCA | CAN | BNSF | RR Worker |
|---|---|---|---|---|---|---|---|---|
| Aarstad | Korey | L | | | Yes | Yes | Yes | |
| Albert | Scott | A | | | Yes | Yes | Yes | |
| Anderson | Mark | D | | | No | Yes | Yes | |
| Anderson | David | B | | | Yes | Yes | Yes | |
| Anderson | Albert | C | | | Yes | Yes | Yes | |
| Ashley, Jr | Charles | H | | | No | Yes | Yes | |
| Bache | John | E | | | Yes | Yes | Yes | |
| Bache - PR Glenda Larson | Cecil | F | | Yes | Yes | No | Yes | |
| Backen | Linda | J | Yes | | Yes | No | Yes | |
| Backen | Daniel | P | | | Yes | Yes | Yes | |
| Baeth | Randall | W | | | Yes | Yes | Yes | |
| Barnett | Richard | O | | | No | No | Yes | |
| Buss | Gerald | L | | | Yes | Yes | Yes | |
| Bibb | Douglas | K | | | Yes | Yes | Yes | Yes |
| Black | Donna | M | | | No | Yes | Yes | |
| Blixt | Jimmy | R | | | Yes | Yes | Yes | |
| Bounsaw | Shelley | A | | | Yes | Yes | Yes | |
| Braaten | Rhonda | R | Yes | | Yes | Yes | Yes | |
| Bredeson | Glenn | L | | | No | Yes | Yes | |
| Brese - PR Jack Brese | Darlene | K | | Yes | Yes | No | Yes | |
| Brooks | Michael | R | | | Yes | Yes | Yes | Yes |
| Brossman | Daniel | W | | | Yes | Yes | Yes | |
| Brossman | Hazel | M | | | Yes | Yes | Yes | |
| Brown | Douglas | | | | Yes | Yes | Yes | |
| Brus | Kirk | C | | | Yes | Yes | Yes | |
| Bulious | Robbin | R | | | Yes | Yes | Yes | |
| Butler | James | R | | | Yes | Yes | Yes | |
| Calloway | Larry | L | | | Yes | Yes | Yes | |
| Camp | Joseph | G | | | Yes | Yes | Yes | |
| Campbell - PR Joseph Campbell | Lorraine | M | | Yes | Yes | Yes | Yes | |
| Carabin, Sr | James | I | | | Yes | Yes | Yes | Yes |
| Carlock | John | E | | | Yes | Yes | Yes | |
| Carpenter | Betsy | E | | | Yes | Yes | Yes | |
| Carr | Gordon | V | | | Yes | Yes | Yes | |
| Carr | Cheri | L | | | Yes | Yes | Yes | |
| Carroll | Violet | M | | | No | No | Yes | |
| Cassel | Keith | | | | Yes | Yes | Yes | |
| Chapel | David | L | | | Yes | Yes | Yes | |
| Choate | Ruth | A | | | No | Yes | Yes | |
| Christensen | Wendy | D | | | Yes | Yes | Yes | |
| Coldiron | Brian | L | | | Yes | Yes | Yes | |
| Coleman | Robert | A | | | Yes | No | Yes | |
| Craigmile | Katherine | M | | | Yes | Yes | Yes | |
| Crismore | Stuart | G | | | Yes | Yes | Yes | |
| Croucher | Kari | C | | | Yes | Yes | Yes | |
| Curtiss | Cymon | A | | | Yes | Yes | Yes | |

| | | | | MD CBS | ICNA | BNSF | Workers |
|---|---|---|---|---|---|---|---|
| Day | Robert | L | | Yes | Yes | Yes | |
| Dendinger | Roxann | L | | Yes | Yes | Yes | |
| Disney | David | L | | Yes | Yes | Yes | |
| Dorrington | Linda | L | | Yes | Yes | Yes | |
| Dokson | Todd | A | | Yes | Yes | Yes | |
| Drake | Kenneth | L | | Yes | Yes | Yes | |
| Edwards | Sheri | A | | Yes | Yes | Yes | |
| Engebretson | Robert | C | | Yes | Yes | Yes | Yes |
| Evans | Kelly | W | | Yes | No | Yes | |
| Farmes | Rhonda | S | | Yes | No | Yes | |
| Ferch | Debra | J | | Yes | Yes | Yes | |
| Foote | Ronald | A | | Yes | Yes | Yes | |
| Fore | Alton | O | | Yes | Yes | Yes | |
| Fox | Ralph | E | | No | Yes | Yes | |
| Funk - PR Alvin Funk | Arath | F | Yes | No | No | Yes | |
| Gilinger | Dale | L | | No | Yes | Yes | |
| Goosey | Kristine | A | | Yes | Yes | Yes | |
| Gostneli | Joseph | A | | Yes | Yes | Yes | |
| Gullingsrud | Rick | L | | Yes | Yes | Yes | |
| Hartmann | Wayne | W | | Yes | Yes | Yes | |
| Haywood | Dianna | L | | No | Yes | Yes | |
| Hefty | Joel | B | | Yes | No | Yes | |
| Hoffman | Jeanette | H | | Yes | Yes | Yes | |
| Javorsky | Cheril | L | | Yes | Yes | Yes | |
| Javorsky | Robert | J | | No | Yes | Yes | |
| Jelissed | Ramona | J | | Yes | Yes | Yes | |
| Johnson | Jimmy | H | | Yes | Yes | Yes | |
| Johnson | Melody | L | | Yes | Yes | Yes | |
| Kowalski PR-Defendor Neuman Krumscher | Orville | D | Yes | Yes | Yes | Yes | Yes |
| Kelley | Darald | E | | Yes | Yes | Yes | |
| Kenoly | Sandra | S | | Yes | Yes | Yes | |
| Kingery | David | A | | Yes | Yes | Yes | |
| Kim | Benjamin | F | | No | Yes | Yes | |
| Koskela | Lynn | M | | Yes | Yes | Yes | |
| Koskela | Leonard | H | | Yes | Yes | Yes | |
| LaBelle | Bradley | L | | Yes | Yes | Yes | |
| Lampton | Lee | S | | Yes | Yes | Yes | |
| Lampton | Linda | L | | No | Yes | Yes | |
| Leir | Sidney | L | | No | No | No | |
| Leim | David | L | | Yes | Yes | Yes | |
| Loomis | Deborah | K | | Yes | Yes | Yes | |
| Madison | Steven | H | | Yes | Yes | Yes | |
| Magone | Terry | D | | Yes | Yes | Yes | |
| Mallo | Sandra | J | | Yes | Yes | Yes | |
| Masterson | Linda | A | | Yes | Yes | Yes | |
| McDonald | David | D | | Yes | Yes | Yes | |

Exhibit "A" Aarstad et al v BNSF et al

| Last Name | First Name | Middle | AGG CA | Wrongful Death | MT Gas | CWA | BNSF | RR Water |
|---|---|---|---|---|---|---|---|---|
| McNulty | Roberta | J | | | Yes | Yes | Yes | |
| Molinelli | Margaret | A | | | No | Yes | Yes | |
| Munro | Norma | T | | | Yes | Yes | Yes | |
| Munson | Sharon | L | | | Yes | Yes | Yes | |
| Murch | Sandra | D | | | Yes | No | Yes | |
| Nelson | Shayne | A | | | Yes | Yes | Yes | |
| Neubauer | Kevin | R | | | Yes | Yes | Yes | |
| Nixon | Shirley | M | | | Yes | Yes | Yes | |
| Noble | Scott | N | | | No | Yes | Yes | |
| Nosler | Paulette | D | | | Yes | Yes | Yes | |
| O'Brien | Patrick | H | | | Yes | Yes | Yes | |
| O'Brien | Dilda | J | | | Yes | Yes | Yes | |
| Olsen | Mark | D | | | Yes | Yes | Yes | |
| Olson | Wade | L | | | Yes | Yes | Yes | |
| O'Neill | John | M | | | Yes | Yes | Yes | |
| Oniboni | Carl | L | | | Yes | Yes | Yes | Yes |
| Osborne | Lyndon | J | | | Yes | Yes | Yes | |
| Parker | Michael | J | Yes | | Yes | Yes | Yes | |
| Pennock | Betty | L | | | Yes | Yes | Yes | |
| Phillips | Gray | W | | | Yes | Yes | Yes | |
| Phillips | Dale | B | | | Yes | Yes | Yes | |
| Possett | Wayne | B | | | No | Yes | Yes | |
| Powers, Sr | James | M | | | No | Yes | Yes | |
| Price | A. Terry | | | | Yes | Yes | Yes | |
| Quinn | Dennis | G | | | Yes | Yes | Yes | |
| Quinn | Daniel | K | | | Yes | Yes | Yes | |
| Randall | Allan | V | | | Yes | Yes | Yes | |
| Randall | Alvin | G | | | Yes | Yes | Yes | |
| Rayson | Clayton | R | | | Yes | Yes | Yes | |
| Rayson - PR to be ?? | Pat | N | | Yes | Yes | Yes | Yes | |
| Richard | Steven | J | | | No | Yes | Yes | |
| Roberts | Joellen | | | | Yes | Yes | Yes | |
| Robins | Todd | E | | | Yes | Yes | Yes | |
| Robins | Gerard | D | | | Yes | Yes | Yes | |
| Roose | June | J | | | Yes | Yes | Yes | |
| Root | Valette | D | | | Yes | Yes | Yes | |
| Rose | Claire | C | Yes | | Yes | No | Yes | |
| Rowberry - PR Claire Rowberry | William | R | | | Yes | Yes | Yes | |
| Ruff | Peggy | S | | | Yes | Yes | Yes | |
| Ryan | Patrick | H | | | Yes | Yes | Yes | |
| Sailor | Rebecca | J | | | Yes | No | Yes | |
| Saracino | Salvador | F | Yes | | No | Yes | Yes | |
| Sather | Marvin | C | | | Yes | Yes | Yes | |
| Schuren | Kathleen | E | | | Yes | Yes | Yes | |
| Schuss | Dietmar | G | | | Yes | Yes | Yes | |

Exhibit "A"    Aarstad et al v BNSF et al    Page 3 of 5

| Last Name | First Name | Middle | BA | Widow's Death | MDC/Cat | PNA | BNSF | Widow/Worker |
|---|---|---|---|---|---|---|---|---|
| Schiele - PR to be ?? | Harold | L | | | Yes | Yes | Yes | |
| Shelton | Jeffrey | M | | | Yes | Yes | Yes | |
| Shoemaker | Leonard | K | | | Yes | Yes | Yes | |
| Sikes | Betty | A | | | Yes | Yes | Yes | |
| Skranak | David | W | Yes | | Yes | Yes | Yes | |
| Staler | Florence | E | | | Yes | Yes | Yes | |
| Smith - PR Calvin Smith | Donald | Ray | | Yes | Yes | No | Yes | Yes |
| Stamper | Brenda | S | | | Yes | Yes | Yes | |
| Steiger - PR Tami M. Steiger | Terry | L | | | Yes | Yes | Yes | |
| Stevens | Timber | K | | | No | Yes | Yes | |
| Stewart | Ellis | D | | | Yes | Yes | Yes | |
| Stubbs | Glenn | N | | | Yes | Yes | Yes | |
| Sundt | Melvin | G | | | Yes | No | Yes | |
| Swearingen | Thomas | V | | | No | Yes | Yes | |
| Swinley | Hugh | E | Yes | | Yes | No | Yes | |
| Switzer | Lee Ann | | | | Yes | Yes | Yes | |
| Torgison | Daniel | W | | | Yes | Yes | Yes | |
| Van Alstine | Betty | H | | | Yes | Yes | Yes | |
| Van Alstine | G. Michael | | | | Yes | No | Yes | |
| Vinion | Betty | F | | | Yes | No | Yes | |
| Volkenand | Julie | A | | | Yes | Yes | Yes | |
| Walen | Lane | M | | | Yes | Yes | Yes | |
| Welcome | Debbra | K | | | Yes | Yes | Yes | |
| West | Sue | C | | | Yes | Yes | Yes | |
| West | George | L | | | Yes | Yes | Yes | |
| Weston - PR Melba Weston | Edwin | B | Yes | Yes | Yes | Yes | Yes | |
| Whitehouse | Sara | A | | | No | Yes | Yes | |
| Wilburn | Robert | D | | | Yes | Yes | Yes | Yes |
| Wiley | Larry | J | | | No | Yes | Yes | |
| Williams | David | M | | | No | Yes | Yes | |
| Winn | Clarence | J | | | No | Yes | Yes | |
| Wipe | Harold | M | | | Yes | Yes | Yes | |
| Woller | Judy | M | | | Yes | Yes | Yes | |
| Young | Patrick | J | | | Yes | Yes | Yes | |
| Zwang | David | J | | | Yes | Yes | Yes | Yes |
| Kelley | Peggy | A | Yes | | No | Yes | Yes | |
| Stineback | Mary | A | Yes | | Yes | Yes | Yes | |
| Riddle | Steven | J | | | Yes | Yes | Yes | |
| Thompson | Thomas | O | | | Yes | Yes | Yes | |
| Parker | Jessie | M | | | Yes | Yes | Yes | |
| Messick | Rebecca | N | | | Yes | Yes | Yes | |
| McNulty | Greg | | | | Yes | Yes | Yes | |
| Magone | Steven | R | | | Yes | Yes | Yes | |

| Last Name | First Name | Middle | ARD CA | Wrongful Death | IMD Cass | CNA | BNSF | IMD Worker |
|-----------|-----------|--------|--------|----------------|----------|-----|------|------------|
| Lockwood | Carol | A | | | No | Yes | Yes | |
| Lockwood | Grover | W | | | No | Yes | Yes | |
| Koskela | Shirley | Y | | | Yes | Yes | Yes | |
| Hunter | Clarence | | | | Yes | No | Yes | |
| Dodge | Suzanne | | | | Yes | Yes | Yes | |
| Dodge | Mark | D | | | Yes | Yes | Yes | |
| Decker | Wesley | M | | | Yes | Yes | Yes | |
| Collins | Delbert | L | | | No | Yes | Yes | |
| Clairmont | Michael | J | | | Yes | Yes | Yes | |
| Chapman | Michael | D | | | Yes | Yes | Yes | |
| Chamberlain | Debra | K | | | Yes | Yes | Yes | |
| Knowles | Sammy | L | | | No | Yes | Yes | |

Chad M. Knight
Anthony M. Nicastro
Nadia Patrick
Steven T. Williams
KNIGHT NICASTRO, LLC
519 Southwest Blvd.
Kansas City, MO 64108
Email:  knight@knightnicastro.com
        nicastro@knightnicastro.com
        npatrick@knightnicastro.com
        williams@knightnicastro.com
Telephone: (816) 853-9845
Facsimile: (303) 845-9299
**ATTORNEYS FOR DEFENDANT**
**BNSF RAILWAY COMPANY**

CLERK OF DISTRICT COURT
FAYE MCWILLIAMS

17 AUG -4  PM 1: 53

FILED

BY_____
        DEPUTY

## MONTANA EIGHTH JUDICIAL DISTRICT COURT
## CASCADE COUNTY

| | |
|---|---|
| KOREY L. AARSTAD, et al. ) | Cause No. DV-16-785 |
| ) | |
| PLAINTIFF, ) | |
| ) | |
| VS. ) | **DEFENDANT BNSF'S REQUEST FOR** |
| ) | **STATEMENT OF DAMAGES** |
| BNSF RAILWAY COMPANY, a ) | |
| Delaware corporation; JOHN SWING; ) | |
| MARYLAND CASUALTY COMPANY, ) | |
| a Maryland Corporation; CNA ) | |
| INSURANCE, a corporation; ) | |
| CONTINENTAL CASUALTY ) | |
| COMPANY, a corporation; ) | |
| TRANSPORTATION INSURANCE ) | |
| COMPANY; a CORPORATION; ) | |
| ROBINSON INSULATION COMPANY, ) | |
| a Montana corporation for profit; and ) | |
| DOES A-Z. ) | |
| ) | |
| DEFENDANTS. ) | |

# EXHIBIT D

COMES NOW Defendant, BNSF Railway Company ("BNSF"), and propounds the following Request for Statement of Damages pursuant to Mont. Code Ann § 25-4-312, to be answered by Plaintiffs[1] within fifteen days:

BNSF requests a statement setting forth the nature and amount of damages being sought.

Pursuant to Mont. Code Ann § 25-4-312, this request shall be filed and served upon the Plaintiff. A responsive statement as to damages must be filed and served within 15 days thereafter.

Please be further advised that, pursuant to Mont. Code Ann § 25-4-312, in the event that a response is not served, BNSF may petition the Court for an order compelling a responsive statement.

**KNIGHT NICASTRO, L.L.C.**

By: _____

CHAD M. KNIGHT (MT#12678)
ANTHONY M. NICASTRO (MT#9964)
NADIA PATRICK (MT#37722859)
STEVEN T. WILLIAMS (MT#11980)

**ATTORNEYS FOR DEFENDANT
BNSF RAILWAY COMPANY**

---

[1] See Attached Plaintiff's Exhibit A to their Complaint regarding additional Plaintiff's to this matter.

## CERTIFICATE OF SERVICE

I hereby certify that the original of the foregoing was delivered to the Clerk of District Court and upon the following counsel via United States Postal Service, postage prepaid, on this 31st day of July, 2017:

John F. Lacey
Roger Sullivan
Allan M. McGarvey
345 First Avenue East
Kalispell, MT 59901
(406) 752-5566
*Attorneys for Plaintiff*

CHAD M. KNIGHT

Roger Sullivan
Allan M. McGarvey
John F. Lacey
McGarvey, Heberling, Sullivan & Lacey, P.C.
345 First Avenue East
Kalispell, MT  59901
(406) 752-5566

Attorneys for Plaintiffs



MONTANA EIGHTH JUDICIAL DISTRICT, CASCADE COUNTY

| | |
|---|---|
| KOREY L. AARSTAD, et al, | **CAUSE NO. DDV-16-785** |
| Plaintiffs, | |
| v. | **RESPONSE TO DEFENDANT BNSF'S REQUEST FOR STATEMENT OF DAMAGES** |
| BNSF RAILWAY COMPANY, a Delaware corporation; JOHN SWING; MARYLAND CASUALTY COMPANY, a Maryland Corporation;  ROBINSON INSULATION COMPANY, a Montana Corporation for profit; and DOES A-Z, | |
| Defendants. | |

By and through counsel, Plaintiffs file the following Response to Defendant

BNSF's Request for Statement of Damages ("BNSF's Request").

### INTRODUCTION

BNSF's request for a "statement setting forth the nature and amount of damages

being sought" pursuant to § 25-4-312, MCA, falls outside the scope of discovery under

Montana law.  *See*, M.R. Civ. P., Rules 26-37.  Therefore, Plaintiffs have no duty to

supplement their Response to BNSF's Request.

Montana law further recognizes that any filing made here in response to BNSF's

Request will be superseded by future filings and the actual discovery in this case, such

**EXHIBIT E**

that this Response and any examination related thereto is inadmissible.  *See, e.g., Craig v. Schell*, 1999 MT 40, 293 Mont. 323, 975 P.2d 820.  Accordingly, Plaintiffs' Response includes notice that Plaintiffs will object to any attempt by BNSF to use or introduce this Response during discovery or trial of this matter.

## DAMAGES

Plaintiffs have incurred special damages in the form of medical expenses, and anticipate incurring future medical and other related expenses as a result of their asbestos related disease.  It is impossible to know the full course of Plaintiffs' diseases at this time. Experience and the scientifically proven progressive nature of asbestos disease caused by exposure to Libby asbestos reasonably suggests that Plaintiffs' special damages may exceed $100,000.

Plaintiffs also intend to pursue a claim for general damages, and reserve here the right to claim all damages identified in their Complaint and any subsequent amendments. Determining general damages falls within the exclusive province of the jury.  *See, e.g., Albinger v. Harris*, 2002 MT 118, ¶ 44, 310 Mont. 27, 48 P.3d 711; *Simchuk v. Angel Island Community Ass'n*, 253 Mont. 221, 230, 833 P.2d 158, 163 (1992) (overruled on other grounds).  Again, the full course of Plaintiffs' asbestos-related disease and the general damages that they will experience is not known at this time.

Experience from many years of Libby settlements and verdicts suggests that general damages for an individual suffering mild asbestos disease will reasonably exceed $300,000.  General damages for more advanced moderate disease will reasonably exceed $500,000, and severe disease, or if currently diagnosed with asbestos-related cancer, will

reasonably lead to general damages in excess of $700,000, and as high as $2 million. Based on experience representing similarly situated plaintiffs, it is expected that a plaintiff with diagnosed asbestos disease will have general damages of at least $200,000 even at a normal level of impairment.  General damages for plaintiffs alleging wrongful death of a loved one are reasonably expected to exceed $500,000, and may reach as high as $1.5 million.

The attached Exhibit One lists each Plaintiff and identifies their current disease level[1], and further incorporates the expectation that all currently normal, mild, or moderate claims are expected to deteriorate to severe disease.

DATED this ____ day of August, 2017.

McGARVEY, HEBERLING, SULLIVAN
& LACEY

By: _____
JOHN F. LACEY
ROGER SULLIVAN
ALLAN M. McGARVEY
Attorneys for Plaintiffs

CERTIFICATE OF MAILING

I hereby certify that on the ____ day of August, 2017, a true and correct copy of the foregoing was served by United States mail, first-class postage prepaid, upon the following:

Chad M. Knight
Anthony M. Nicastro
Nadia Patrick
Steven T. Williams
Knight Nicastro, LLC
519 Southwest Blvd.

---

[1] According to the latest medical records on file with counsel.

Response to Defendant BNSF's Request for Statement of Damages     3

Kansas City  MO  64108
Attorneys for BNSF and John Swing

Judy O'Haire

| LastName | FirstName | Middle | Disease Level |
|---|---|---|---|
| Aarstad | Korey | L | NORMAL |
| Albert | Scott | A | NORMAL |
| Anderson | Albert | C | MODERATE |
| Anderson | David | B | MILD |
| Anderson | Mark | D | NORMAL |
| Ashley, Jr | Charles | H | NORMAL |
| Bache | John | E | MILD |
| Bache - PR Glenda Larson | Cecil | F | WRONGFUL DEATH |
| Backen | Daniel | P | NORMAL |
| Backen | Linda | J | CANCER |
| Baeth | Randall | W | NORMAL |
| Barnett | Richard | D | NORMAL |
| Bass | Gerald | L | SEVERE |
| Bibb | Douglas | K | MILD |
| Black | Donna | M | NORMAL |
| Blixt | Jimmy | R | SEVERE |
| Boursaw | Shelley | A | NORMAL |
| Braaten - PR Kenneth Braaten | Rhonda | R | MESO |
| Bredeson | Glenn | L | NORMAL |
| Brese - PR Jack Brese | Darlene | K | WRONGFUL DEATH |
| Brooks - PR James Brooks | Michael | E | WRONGFUL DEATH |
| Brossman | Daniel | W | NORMAL |
| Brossman | Hazel | M | NORMAL |
| Brown | Douglas | L | NORMAL |
| Brus | Kirk | C | NORMAL |
| Butkus | Robbin | R | SEVERE |
| Butler | James | E | SEVERE |
| Calloway | Larry | L | MODERATE |
| Camp | Joseph | G | SEVERE |
| Campbell - PR Joseph Campbell | Hermine | M | WRONGFUL DEATH |
| Carabin, Sr | James | T | NORMAL |
| Carlock | John | E | NORMAL |
| Carpenter | Betsy | E | MILD |
| Carr | Cheri | L | NORMAL |
| Carr | Gordon | V | NORMAL |
| Carroll | Violet | M | SEVERE |
| Cassel | Keith | N | NORMAL |
| Chamberlain | Debra | K | NORMAL |
| Chapel | David | L | MODERATE |
| Chapman | Michael | D | NORMAL |
| Choate - PR to be ?? | Ruth | A | WRONGFUL DEATH |
| Christensen | Wendy | D | NORMAL |
| Clairmont | Michael | J | NORMAL |
| Coldiron | Brian | L | NORMAL |
| Coleman | Robert | A | NORMAL |
| Collins | Delbert | L | MILD |

Exhibit One, Assessment 1, Brief

| LastName | FirstName | Middle | Disease Level |
|---|---|---|---|
| Craigmile | Katherine | M | NORMAL |
| Crismore | Stuart | G | NORMAL |
| Croucher | Kurt | C | MILD |
| Curtiss | Cymon | A | MILD |
| Day | Robert | L | NORMAL |
| Decker | Wesley | M | NORMAL |
| Dentlinger | Roxann | L | NORMAL |
| Dodge | Mark | D | NORMAL |
| Dodge | Suzanne | N | NORMAL |
| Doney | David | L | NORMAL |
| Dorrington | Linda | L | NORMAL |
| Dotson | Todd | A | NORMAL |
| Drake | Kenneth | L | NORMAL |
| Edwards | Sheri | A | MILD |
| Engebretson | Robert | C | MILD |
| Evans | Kelly | W | NORMAL |
| Farnes | Rhonda | S | MODERATE |
| Ferch | Debra | J | NORMAL |
| Foote | Ronald | A | NORMAL |
| Fore | Alton | O | * |
| Fox | Ralph | E | NORMAL |
| Funk - PR Alvin Funk | Anita | F | WRONGFUL DEATH |
| Ginger | Dale | L | MILD |
| Godsey | Kristine | A | NORMAL |
| Gostnell | Joseph | A | NORMAL |
| Gullingsrud | Rick | L | MILD |
| Hartmann | Wayne | W | MILD |
| Haywood | Dianna | L | NORMAL |
| Hefty - PR Bonita Hefty | Joel | B | WRONGFUL DEATH |
| Hoffman - PR to be ?? | Jeanette | H | SEVERE |
| Hunter | Clarence | | SEVERE |
| Javorsky | Cheri | L | NORMAL |
| Javorsky | Robert | J | MILD |
| Jellesed | Ramona | J | NORMAL |
| Johnson | Jimmy | D | NORMAL |
| Johnson | Melody | L | SEVERE |
| Johnson - PR Brenda Neuman Brunscher | Orville | D | WRONGFUL DEATH |
| Kelley | Darald | E | NORMAL |
| Kelley | Peggy | A | CANCER |
| Kenelty | Sandra | S | MODERATE |
| Kingery | David | A | NORMAL |
| Klin | Benjamin | F | NORMAL |
| Knowles | Sammy | L | NORMAL |
| Koskela | Leonard | H | NORMAL |
| Koskela | Lynn | M | NORMAL |
| Koskela | Shirley | Y | SEVERE |

8/10/2017

| LastName | FirstName | Middle | Disease Level |
|---|---|---|---|
| LaBelle | Bradley | L | NORMAL |
| Lampton | Lee | S | NORMAL |
| Lampton | Linda | L | NORMAL |
| Leir | Sidney | L | MILD |
| Lelm | David | L | NORMAL |
| Lockwood | Carol | A | NORMAL |
| Lockwood | Grover | W | MILD |
| Loomis | Deborah | K | NORMAL |
| Madison | Steven | R | NORMAL |
| Magone | Steven | R | NORMAL |
| Magone | Terry | D | NORMAL |
| Maile | Sandra | J | NORMAL |
| Masterson | Linda | A | NORMAL |
| McDonald | David | D | MODERATE |
| McNulty | Gregory | E | NORMAL |
| McNulty | Roberta | J | NORMAL |
| Messick | Rebecca | N | NORMAL |
| Molinelli | Margaret | A | NORMAL |
| Munro | Norma | T | SEVERE |
| Munson | Sharon | L | MILD |
| Murch | Sandra | D | NORMAL |
| Nelson | Shayne | A | NORMAL |
| Neubauer | Kevin | R | SEVERE |
| Nixon - PR Cynthia Rae Sikes | Shirley | M | WRONGFUL DEATH |
| Noble | Scott | N | NORMAL |
| Nosler | Paulette | D | NORMAL |
| O'Brien | Drilda | J | SEVERE |
| O'Brien | Patrick | H | * |
| Olsen | Mark | D | MILD |
| Olson | Wade | L | NORMAL |
| O'Neill | John | M | NORMAL |
| Orsborn | Carl | L | SEVERE |
| Osborne | Lyndeen | J | SEVERE |
| Parker | Jessie | M | NORMAL |
| Parker | Michael | J | CANCER |
| Pennock - PR Alfred Pennock | Betty | L | WRONGFUL DEATH |
| Phillips | Dale | B | MILD |
| Phillips | Greg | W | SEVERE |
| Posselt | Wayne | B | NORMAL |
| Powers, Sr | James | M | MODERATE |
| Price | A. Tony | | NORMAL |
| Quinn | Daniel | K | NORMAL |
| Quinn | Dennis | G | NORMAL |
| Randall | Allan | V | NORMAL |
| Randall | Alvin | G | NORMAL |
| Rayson | Clayton | R | NORMAL |

Exhibit One, Aasianment 1, Page 63

| LastName | FirstName | Middle | Disease Level |
|---|---|---|---|
| Rayson - PR to be ?? | Pat | N | WRONGFUL DEATH |
| Richard | Steven | J | NORMAL |
| Riddle | Steven | J | MILD |
| Roberts | Joellen | | NORMAL |
| Robins | Gerald | D | * |
| Robins | Todd | E | NORMAL |
| Roose | June | J | NORMAL |
| Root | Valerie | D | NORMAL |
| Rose | Claire | C | CANCER |
| Rowberry - PR Clarise Rowberry | William | R | WRONGFUL DEATH |
| Ruff | Peggy | S | MILD |
| Ryan | Patrick | H | MILD |
| Sailer | Rebecca | J | SEVERE |
| Saracino | Salvador | F | CANCER |
| Sather | Marvin | C | NORMAL |
| Scharen | Kathleen | E | MILD |
| Schauss | Dietmar | G | MILD |
| Schiele - PR Maria Schiele | Harold | L | WRONGFUL DEATH |
| Shelton | Jeffrey | M | NORMAL |
| Shoemaker | Leonard | K | SEVERE |
| Sikes | Betty | A | NORMAL |
| Skranak | David | W | CANCER |
| Slater | Florence | E | SEVERE |
| Smith - PR Calvin Smith | Donald | Ray | WRONGFUL DEATH |
| Stamper | Brenda | S | NORMAL |
| Steiger - PR Tami M. Steiger | Terry | L | WRONGFUL DEATH |
| Stevens | Timber | K | MILD |
| Stewart | Ellis | D | SEVERE |
| Stineback | Mary | A | CANCER |
| Stubbs | Glenn | N | NORMAL |
| Sundt | Melvin | G | MODERATE |
| Swearingen | Thomas | V | MILD |
| Swimley - PR Alison Swimley | Hugh | E | CANCER |
| Switzer | Lee Ann | | NORMAL |
| Thompson | Thomas | D | NORMAL |
| Torgison | Daniel | W | NORMAL |
| Van Alstine | Betty | R | MILD |
| Van Alstine | G. Michael | | MILD |
| Vinion | Betty | F | NORMAL |
| Volkenand | Julie | A | MODERATE |
| Walen | Lana | M | NORMAL |
| Welcome | Debbra | K | SEVERE |
| West | George | L | MODERATE |
| West | Sue | C | NORMAL |
| Weston - PR Melba Weston | Edwin | B | CANCER |
| Whitehouse | Sara | A | SEVERE |

8/10/2017

| LastName | FirstName | Middle | Disease Level |
|----------|-----------|--------|---------------|
| Wilburn | Robert | D | SEVERE |
| Wiley | Larry | J | NORMAL |
| Williams | David | M | NORMAL |
| Winn | Clarence | J | NORMAL |
| Wise | Harold | M | MODERATE |
| Woller | Judy | M | NORMAL |
| Youso | Patrick | J | NORMAL |
| Zwang | David | J | NORMAL |

8/10/2017

1   Chad M. Knight (MT #12678)
    Knight Nicastro LLC
2   929 Pearl Street, Suite 350
    Boulder, CO 80302
3   (303) 815-5869
4   knight@knightnicastro.com

5   Anthony Nicastro
    Knight Nicastro LLC
6   401 North 31st Street, Suite 770
    Billings, MT 59101
7   (406) 702-1935
8   nicastro@knightnicastro.com

9

10              **MONTANA EIGHTH JUDICIAL DISTRICT COURT**
                         **CASCADE COUNTY**

11

12   Korey  L. Aarstad, et al.              )
                                            )   Cause No. DV-16-785
13              Plaintiffs,                 )
                                            )
14   vs.                                    )   **NOTICE OF FILING OF**
                                            )   **NOTICE OF REMOVAL**
15                                          )
     BNSF RAILWAY COMPANY, a                )
16   Delaware corporation; MARYLAND         )
     CASUALTY COMPANY, a Maryland           )
17   Corporation; CNA INSURANCE             )
     COMPANIES, a corporation;              )
18   CONTINENTAL CASUALTY                   )
     COMPANY,  a corporation;               )
19   TRANSPORATION INSURANCE                )
     COMPANY, a corporation; ROBINSON       )
20   INSULATION COMPANY, a Montana          )
     Corporation for profit; and DOES A-Z, )
21                                          )
                Defendants.                 )
22                                          )

23

24          PLEASE  TAKE  NOTICE,  that  on  August  16,  2017,  Defendants  BNSF  Railway

25   Company, filed its Notice of Removal in the United States District Court for the District of

26
     Montana, removing this action from the Eighth Judicial District Court, Cascade County,
27

28
     PAGE - 1                                        **KNIGHT NICASTRO, L.L.C.**
                                                           929 PEARL STREET, SUITE 350
                                                                BOULDER, CO 80302
                                                                   (303) 815-5869

                            **EXHIBIT F**

Montana (Cause No. DV-16-785) to the United States District Court for the District of Montana, Great Falls Division, together with a copy of all process, pleadings and orders.

A true and correct copy of the *Notice of Removal*, with all exhibits, is attached as Exhibit 1.

Such action has effected the removal of this action to the United States District Court for the District of Montana in accordance with the provisions of 28 U.S.C. §§ 1441 and 1446, and no further proceedings may be had in the state court action.

DATED THIS 16th DAY of August, 2017.

**KNIGHT NICASTRO, L.L.C.**

By: _____
CHAD M. KNIGHT (MT#12678)
ANTHONY M. NICASTRO (MT#9964)
NADIA PATRICK (MT#37722859)
STEVEN T. WILLIAMS (MT#11980)

**ATTORNEYS FOR DEFENDANT
BNSF RAILWAY COMPANY**

PAGE - 2

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

## **CERTIFICATE OF SERVICE**

I hereby certify that the original of the foregoing was served upon the following

counsel of record by the means designated below on this 16th day of August, 2017:

[X]   U.S. Mail                    Roger Sullivan
[  ]   Federal Express         Allan M. McGarvey
[  ]   Hand Delivery           John F. Lacey
[  ]   Facsimile                  McGarvey, Heberling, Sullivan & Lacey, P.C.
[X ]  Email                        345 First Avenue East
                                        Kalispell, MT 59901


_____
Chad M. Knight

PAGE - 3